IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| v. | * | CASE NO. ELH19-0369 |
| CARL SOMERLOCK | * | |

* * * * * * * * * * * *

**<u>DEFENDANT'S REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION TO SUPPRESS AND REQUEST FOR *FRANKS* HEARING</u>**

The Defendant, by and though his attorneys, Robert C. Bonsib, Esq. and Andrew C. White, Esq., respectfully submits this reply to the government's response to the Defendant's motion to suppress evidence and request for a *Frank*s hearing and, in furtherance thereof, states as follows:

**I.     DEFENDANT HAS MET THE REQUIREMENTS FOR A *FRANKS* HEARING**

As set out in Defendant's motion to suppress, and as the government acknowledges, a *Franks* hearing is warranted if the defendant shows that the affiant (1) made a false statement, (2) intentionally or with reckless disregard for the truth, (3) that was necessary to the finding of probable cause.  Mot. to Suppress at 3–4; Gov't Resp. at 6.  There is no real dispute here that the first and third requirements have been met.

The warrant in this case was issued under § 5-607 of the Public Safety Article of the Maryland Code, which allows a court to issue a search warrant for the removal of a firearm upon a showing of "probable cause to believe that a respondent who is subject to an extreme risk protective order possesses a firearm and [has] failed to surrender the firearm in accordance with the order."  Md. Code. Ann., Pub. Safety § 5-607.  To show that the requirements of the statute had been satisfied, the affiant, Corporal Molly Gale, represented that there was probable cause to believe that Defendant's wife, Christine Moore, was in possession of firearms "contrary to" an

extreme risk protective order ("ERPO").  *See* Mot. Ex. 7, affidavit at 2 ("Your affiant believes there is probable cause that respondent is in possession of firearms contrary to the Court's Order."). The government, in the midst of its dramatic retelling of the facts, implicitly concedes that this assertion could not have been true because when police obtained the search warrant, the ERPO *had not even been served on Moore*, and thus could not have been violated.  *See* Gov't Resp. at 5 (acknowledging that warrant was obtained at 8:50 p.m. and that the ERPO was served nine minutes later, at 8:59 p.m.).  Indeed, the government makes no argument that the affidavit did not include a false statement.  The first requirement for *Franks* hearing has therefore been satisfied.  Moreover, because the government cannot and does not seriously argue that Gale's false statement was unnecessary to a finding of probable cause, the third requirement was satisfied as well.  That leaves only the second requirement, which is where the government focuses its response.  Criticizing Defendant for focusing "too much . . . on facts" and "[t]oo little . . . on intent," the government offers various reasons why, in its view, Gale's false statement was only a "mistake" or "fluke," and not an intentional or reckless falsehood.  *Id*. at 14, 16.  As detailed below, the facts on which the government would prefer not to focus show that Gale's falsehood cannot be excused as an unintentional "fluke."  Defendant has made the substantial preliminary showing necessary for a *Franks* hearing, and once the false statement is removed from the affidavit, the warrant cannot survive.

        **A.**      <u>**The Government offers no valid excuse for Gale's false statement.**</u>

            1.      *There was no emergency because Moore was secure in the hospital.*

The first of several excuses offered by the government for Gale's false statement is that she "quickly drafted an affidavit during an emergency involving suicide threats and claims that 'many firearms were all around the house in plain view."  Gov't Resp. at 7.  The facts show

otherwise. Gale's testimony at the hearing on the final ERPO[1] shows that police decided to apply for the ERPO and search warrant *after* Moore had been taken to the Howard County Hospital for an emergency evaluation.[2] Mot. Ex. 2 at 22, 26, 51. Gale also testified at the hearing that police "had the house closed off[,] [s]o nobody could go in there," and that she "had no evidence that [Moore] had any guns on her person." *Id.* at 45, 53. Thus, the "many firearms . . . all around the house in plain view" were not accessible to Moore when Gale sought the warrant. Not only do these facts show that there was no "emergency" when Gale applied for the warrant, they call into question whether police even had a good-faith basis for obtaining the ERPO on which the warrant was based.

The ERPO statute requires a petitioner to "set forth specific facts" showing that "the respondent poses an *immediate and present danger* of causing personal injury to the respondent, the petitioner, or another by possessing a firearm." Md. Code Ann., Pub Safety § 5-602(a)(1) (emphasis added). Here, the specific facts set forth in the petition were that various firearms were located "throughout the residence" and that Moore had "indicated she took a loaded handgun and cocked it because she 'wanted to die.'" Mot. Ex. 1 at 2 (capitalization altered). But once Moore was taken to the hospital for an emergency evaluation—where she remained for *two days*, *see* Mot Ex. 8 at 51 (discharge summary dated 4/2/19)—she had no access to any guns (as Gale acknowledged) and thus no way to carry out any suicidal threat. Accordingly, at the time police

---

[1] The statutory scheme provides for three types of ERPO's: interim, temporary, and final. *See* Pub. Safety §§ 5-603 to 5-605. Although hearings must be held before temporary and final ERPOs are issued, no hearing is required before the issuance of an interim ERPO, which is the type police used to obtain the warrant here. *See* Pub. Safety § 5-603(b). As detailed in Defendant's motion to suppress, the law as applied in this case violates due process as it permitted the seizure of Defendant's property without a hearing. *See* Mot. to Suppress at 25.

[2] *See* Md. Code Ann., Health-Gen. § 10-620 *et seq.* (specifying procedures for emergency evaluations).

3

obtained the ERPO, after Moore was taken to the hospital, she posed no "immediate and present danger" to herself or anyone else "by possessing a firearm."

These facts suggest that the true motivation for the ERPO, and the search warrant based on it, was to search the house for illegal guns, not to protect Moore. The warrant itself seems to confirm as much, as it authorizes the seizure of not only firearms and ammunition, but also "[i]ndicia of occupancy," "receipts for the purchases of firearms or ammunition," and "[a]ny documents demonstrating possession of firearms or ammunition." Mot. Ex. 7, attachment to application. These additional items posed no danger to Moore, and were not items that police were authorized to seize under Public Safety § 5-607, yet they are precisely the type of items that might prove useful in a criminal prosecution like the one the government has brought here. Moreover, the government's own response confesses that "the police reports show the officers intended to get a search warrant *as early as 7:00pm*," Gov't Resp. at 23 (emphasis added), which is 54 minutes before the ERPO was issued and nearly two hours before Gale obtained the warrant. So based on the evidence, it appears that the affidavit's false statement was not the product of haste during an emergency, but rather part of a deliberate plan to search the house for guns.

    2.    *Gale knew what she needed to say to get a warrant under § 5-607.*

The government also attempts to excuse the affidavit's falsity by noting that Gale was "grappling with a brand new law for the very first time." Gov't Resp. at 7–8; *see also id.* at 15 (noting that Gale was "[w]orking with a new law for the very first time"). But again, a focus on the facts shows otherwise. Gale's testimony from ERPO hearing reveals that she knew full well what the new law required for police to obtain a search warrant:

> That ERPO says she can't have it [guns]. We have to go remove it. She's not consenting for us to sit there and go in there and get it. That's why we're getting the search warrant. *Because once the ERPO is provided to her, if she still has firearms, she can't keep the firearms and the ERPO states she can't have the*

*firearms.*

Mot. Ex. 2 at 51 (emphasis added).

Gale therefore knew what she needed to say in order to establish probable cause for a search warrant under Public Safety § 5-607: that the ERPO had been "provided" to Moore, and that she was "not consenting" to the seizure of the firearms. The problem, of course, is that Moore could not have failed to consent to the terms of an order that she had not received. Yet Gale nonetheless indicated that Moore had done so, because that is what Gale needed to say to get the search warrant.

### 3. *Relying on information provided by other officers is no excuse.*

The government next pleads ignorance on Gale's behalf, stating that "[s]he included in the affidavit whatever information other officers gave her." Gov't Resp. at 8. There is some factual support for this argument, as Gale testified that she included the statement of probable cause in the affidavit "[b]ecause that's the wording that we were advised to use for the search warrants regarding [inaudible] from our command." Mot. Ex. 2 at 49. But the argument fails as a matter of law because claiming that the affiant was just following orders is not a basis for avoiding a *Franks* hearing.

As the Supreme Court recognized in *Franks*, police cannot "insulate one officer's deliberate misstatement merely by relaying it through an officer-affiant personally ignorant of its falsity." *Franks v. Delaware*, 438 U.S. 154, 163 n.2 (1978). It is no excuse, then, that Gale was just relying on "whatever information other officers gave her." Gov't Resp. at 8. "[A] defendant may be entitled to relief under *Franks* if an officer deliberately or recklessly causes a falsehood to appear in an affidavit, even if the affiant him or herself is not at fault." *United States v. Kent*, 652 F. App'x 161, 167 n.2 (4th Cir. 2016) (emphasis added); *see also United States v. Shields*, 458 F.3d 269, 276 (3d Cir. 2006) ("[I]t is beyond question that the police cannot insulate a deliberate

5

falsehood from a *Franks* inquiry simply by laundering the falsehood through an unwitting affiant who is ignorant of the falsehood"); *United States v. Brown*, 298 F.3d 392, 408 (5th Cir. 2002) (Dennis, J., concurring in part) ("[A] defendant is entitled to a *Franks* hearing upon making a substantial preliminary showing that a government official deliberately or recklessly caused facts that preclude a finding of probable cause to be omitted from a warrant affidavit, even if the governmental official at fault is not the affiant."); *United States v. Kennedy*, 131 F.3d 1371, 1376 (10th Cir. 1997) (agreeing with district court that government should be held "accountable for statements made not only by the affiant but also for statements made by other government employees which were deliberately or recklessly false or misleading insofar as such statements were relied upon by the affiant in making the affidavit"); *United States v. Wapnick*, 60 F.3d 948, 956 (2d Cir. 1995) (noting that "when the informant is himself a government official, a deliberate or reckless omission by the informant can still serve as grounds for a *Franks* suppression"); *United States v. DeLeon*, 979 F.2d 761, 764 (9th Cir. 1992) (holding that "a deliberate or reckless omission by a government official who is not the affiant can be the basis for a *Franks* suppression," as "a different rule would permit government officials deliberately to keep from affiants or the court information material to the determination of probable cause and by such conduct avoid the necessity of a *Franks* hearing"); *United States v. Pritchard*, 745 F.2d 1112, 1118 (7th Cir. 1984) (noting that *Franks* applies "when one *government agent* deliberately or recklessly misrepresents information to a second agent, who then innocently includes the misrepresentations in an affidavit").

The affidavit's inclusion of an *affirmatively false* statement based on information provided by *other officers* (assuming Gale did in fact rely on what her "command" told her) distinguishes this case from the Fourth Circuit cases cited by the government. *See* Gov't Resp. at 8–9. This is

not a case that involves "[m]ere imprecision" about which events the affiant personally observed. *United States v. Moody*, 931 F.3d 366, 372 (4th Cir. 2019), *cert. denied*, 140 S. Ct. 823 (2020). Nor is this a case that presents only "a question of omission rather than commission on the part of the agent." *United States v. Colkley*, 899 F.2d 297, 301 (4th Cir. 1990). Nor is it case where the defendant "cannot point to a false statement." *United States v. White*, 850 F.3d 667, 674 (4th Cir. 2017). Nor is it a case where inaccurate information from an informant must be "tolerate[d] . . . so long as the affiant did not mislead the magistrate." *Colkley*, 899 F.2d at 301. Either Gale or someone in her "command" must have known that the ERPO had not been served when Gale applied for the warrant. This satisfies the intent requirement.

        4.      *Warrants must be based on actual facts, not predictions.*

As a final excuse for the affiant's false statement, the government argues that "all of the information [Gale] provided was consistent with what the other officers *later* reported." Gov't Resp. at 8 (emphasis added); *see also id.* at 16–17 (characterizing the timing as a "fluke"). Although the government is correct that Moore was served with the ERPO, she never refused to "surrender the firearms, as required," nor was she able to do so from the hospital where she was served. *Id.* at 17. Had Moore violated the order, moreover, police would have been *required* to arrest her, which never happened. *See* Pub. Safety § 5-610 ("A law enforcement officer *shall* arrest with or without a warrant and take into custody a person who the officer has probable cause to believe is in violation of an interim, temporary, or final extreme risk protective order in effect at the time of the violation." (emphasis added)). So the affidavit here was not rescued by events that occurred after the fact. The requirements for the issuance of a search warrant under Public Safety § 5-607 were *never* fulfilled.

More to the point, the government cites no authority for the proposition that a search

warrant may issue on hopeful predictions—even those that are ultimately proved correct. On the contrary, the rule is that probable cause for a search warrant must be based on "'the known facts and circumstances.'" *United States v. Richardson*, 607 F.3d 357, 369 (4th Cir. 2010) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). The government's argument, if accepted, would permit a police officer to present a search warrant affidavit to a judge alleging that a confidential informant had made a controlled purchase of narcotics from a particular address before any such purchase occurred. Does the lie become less a lie simply because the informant is later able to make the purchase? If unforeseen events occur and the informant cannot make the purchase, what then? Does the lie become any less a lie simply because, to use the government's words, the officer "cures" the false statement in some fashion. The answer is "no." Warrants must be judged based on the facts as they existed at the time the warrant issued. At the time the warrant issued here, either the affiant or someone in her "command" knew that Moore had not violated the ERPO, but Gale stated otherwise in the affidavit anyway. Whether she was later proved correct is irrelevant, the statement was false at the time it was submitted to the magistrate, which is the time that matters.

**B**     <u>**Proof of "bad motive" is not required.**</u>

In addition to the specific excuses for Gale's false statements addressed above, the government more generally seeks to raise the bar for what a defendant must show to obtain a *Franks* hearing, asserting that Defendant "has offered no evidence whatsoever of *bad motive*." Gov't Resp. at 7 (capitalization altered) (emphasis added). Motive, however, need not be shown when the affidavit includes a false statement; an intent to mislead is required only in the case of *omissions*. *Colkley*, 899 F.2d. at 300. The government recognizes this distinction, but then almost immediately attempts to muddy the waters with its suggestion that Defendant must prove "bad

motive." Gov't Resp. at 7. No such requirement exists here. Gale stated under oath a fact that she knew was not true. She did it because she knew she had to make such a statement for Judge Zwaig to issue the search warrant. Had Gale represented the true facts to Judge Zwaig, Judge Zwaig would have undoubtedly told Gale that there was no basis for him to issue the search warrant. This meets all of the requirements for a *Franks* hearing: an affirmatively false statement, made intentionally or recklessly, that is necessary to the finding of probable cause.

The government attempts to diminish the gravity of the error by arguing that Gale's thinking was "not entirely wrong" because she knew that ERPO needed to be "'written and served on Somerlock's wife before the search warrant [could] be conducted,'" and "all she missed was the timing of the warrant signing." Gov't Resp. at 16 (quoting Mot. Ex. 2 at 54). The government's belief that these circumstances fail to show at least recklessness is misguided. If Gale knew what was necessary for the warrant to issue, she should have ensured those conditions had been fulfilled before stating as much in a sworn affidavit. This was not a "technicality," as the government calls it, nor was the warrant "facially valid" when it was presented to Judge Zwaig. *Id.* How can a warrant be "facially valid" when it misrepresents facts that are not true?

Although a showing of "bad motive" is not required, if knowingly making a false statement to a judicial officer is not the functional equivalent of a "bad motive," it is hard to imagine what might be. Accordingly, the intent requirement has been satisfied, and a *Franks* hearing should be held.

## II. THE EVIDENCE IS NOT SAVED BY ANY EXCEPTION TO THE EXCLUSIONARY RULE.

The government offers two exceptions to the exclusionary rule in the event that the warrant is invalidated: (1) something that is not "literally" the good-faith exception but operates just like it, and (2) inevitable discovery. Gov't Resp. at 19–23. Neither of these proposed exceptions saves

the illegally seized evidence.

### A. The government's proposed alternative good-faith exception does not exist and does not apply.

Under *United States v. Leon*, 468 U.S. 897 (1984), suppression of evidence "remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." *Id.* at 923 (citing *Franks*, 438 U.S. 154). The government thus "recognizes" that, if a *Franks* violation occurred, *Leon*'s good-faith exception "is unavailable." Gov't Resp. at 19. Yet the government, without authority, asks the Court to apply something that is "not literally" the good-faith exception, but operates in exactly the same way. *Id.* at 20. Besides having no precedent, the government's good-faith-in-everything-but-name exception to the exclusionary rule does not apply under the facts of this case, for all the reasons discussed. The police did not do "everything by the book." *Id.* at 21. The affiant misrepresented the most important fact necessary to obtain the warrant. This was not objectively reasonable conduct to which the good-faith exception—or something just like it—should apply.

### B. There was no lawful means by which the government inevitably would have discovered the evidence.

The government, perhaps realizing the weakness of its other arguments, transitions to its final backup position of inevitable discovery. This exception to the exclusionary rule, as the government acknowledges, requires it to prove by a preponderance of the evidence two elements: (1) that police *could* have discovered the evidence legally, and (2) that they inevitably *would* have done so. Gov't Resp. at 22 (citing *United States v. George*, 971 F.2d 1113, 1121 (4th Cir. 1992)). These elements have not been met.

On the first requirement, the government states that officers *could* have legally uncovered

the firearms because, "[a]t the time of the search, they had surrounded an empty house with an order directing Somerlock's wife to surrender the firearms inside it, directly and immediately into their possession." Gov't Resp. at 22. With the order, according to the government, the officers would have "inevitably done one of two things—get a warrant or ask for consent." *Id.* The government's hypothetical becomes somewhat unclear at this point, but the theory seems to be that because Moore would have "disobey[ed] the order," and Defendant would not have given consent to search his home, the government *would* have gotten a "different," "independent warrant," thus fulfilling the second requirement for inevitable discovery. Gov't Resp. at 23. The government's argument fails as a matter of law (the "could") and fact (the "would").

Legally, the argument fails because Moore was not in a position to "disobey" the order. When police obtained and served the order, she could not "surrender all firearms and ammunition to law enforcement," as the order required, Mot Ex. 1 at 1 (capitalization altered), because she was in the hospital and did not possess or own any firearms to surrender. There was also no basis on which police could have obtained a legal warrant some other way. Defendant was not the respondent to the ERPO, so his refusal to turn over the firearms would not have allowed police to obtain a warrant; there was no exigency once Moore was hospitalized; and there was no crime for which evidence might be sought. Accordingly, the "could" requirement of inevitable discovery has not been satisfied.

Factually, the government's argument fails because it is relies on a "tenuous string of conjecture," not the type of "demonstrated historical facts" on which inevitable discovery must be based. *United States v. Alston*, 941 F.3d 132, 139 (4th Cir. 2019), *cert. denied*, 140 S. Ct. 1221 (2020). Put simply, there is no evidence that police would have gotten a warrant other than the illegal one they actually got. The government offers only a circular argument that "the evidence

shows that [police] would have obtained a warrant, primarily because they did." Gov't Resp. at 23. By that reasoning, the government satisfies its evidentiary burden whenever it obtains an illegal warrant, because obtaining the *illegal* warrant is proof that police would have obtained a *legal* warrant. This makes no sense and is not how inevitable discovery works. Thus, the "would" requirement of inevitable discovery has not satisfied either, and the exception does not apply.

## CONCLUSION

For each and all of the foregoing reasons, it is respectfully submitted that this Honorable Court should grant the Defendant's motion to suppress evidence.

Respectfully submitted,

MarcusBonsib, LLC


*/s/ Robert C. Bonsib*
ROBERT C. BONSIB
64ll Ivy Lane, Suite ll6
Greenbelt, Maryland 20770
(30l) 44l-3000
Bar No.  00324


Silverman|Thompson|Slutkin|White, LLC


*/s/ Andrew C. White*
ANDREW C. WHITE
201 N. Charles Street, Ste. 2600
Baltimore, Maryland 21201
(410) 385-2225
awhite@mdattorney.com
Bar No. 08825

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a copy of the foregoing motion was sent via ECF this 11th day of May, 2020 via ECF to Assistant United States Attorneys Patricia McLane and Brandon Moore, Office of the United States Attorney for the District of Maryland.

*/s/ Robert C. Bonsib*
ROBERT C. BONSIB