IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

CARL SOMERLOCK,
*Defendant*.

Crim. No. ELH-19-369

**MEMORANDUM OPINION**

In this illegal firearms case, the Court must determine whether to grant a hearing under *Franks v. Delaware*, 438 U.S. 54 (1978), and whether to suppress the evidence obtained from a search warrant executed at the home of defendant Carl Somerlock on March 31, 2019. This Memorandum Opinion resolves only the first issue.

Defendant Carl Somerlock was indicted on July 30, 2019 (ECF 1) and charged with multiple offenses: possession of machine guns, in violation of 18 U.S.C. § 922(o) (Count One); possession of unregistered firearms and a silencer, in violation of 26 U.S.C. §§ 5841, 5845(a), 5845(b), 5861(d), and 5871, and 18 U.S.C. § 921(a)(23), (24) (Count Two); and possession of firearms and a silencer, without serial numbers, in violation of 26 U.S.C. §§ 5845(a), 5845(b), 5861(i), and 5871, and 18 U.S.C. § 921(a)(23), (24) (Count Three). The Indictment followed the search of Somerlock's house on March 31, 2019, which uncovered 42 firearms, including several that are illegal to possess under federal law. The search was conducted pursuant to a warrant issued that day by a Maryland State judge. *See* ECF 23-7 (the "Search Warrant").

The Search Warrant is rooted in a rather new Maryland statute, commonly called the "red flag law." *See* ECF 23 at 24-26. It is found in Subtitle 6 of Title 5 of the Public Safety Article of the Maryland Code (2018 Repl. Vol., 2021 Supp.). Subtitle 6 is called "Extreme Risk Protective Orders." According to the defendant, the Affidavit in support of the Search Warrant, submitted

by Corporal Molly Gale of the Howard County Police Department ("HCPD"), intentionally or recklessly contained material false statements and material omissions. Therefore, defendant has filed a "Motion to Suppress and Request for an Evidentiary Hearing and a *Franks* Hearing." ECF 23 (the "Motion"). The Motion is supported by several exhibits. ECF 23-1 to ECF 23-9.[1]

The government opposes the Motion. ECF 31 (the "Opposition"). And, the defense has replied. ECF 32 (the "Reply"). The government (ECF 39) and the defense (ECF 41) have also submitted supplemental briefing.[2]

The Court held a Motion hearing on April 29, 2022, at which argument was presented.[3] For the reasons that follow, I shall grant the *Franks* hearing.[4]

---

[1] The Motion and the exhibits were filed under seal. Defendant subsequently moved (ECF 26) to lift the seal except as to the Motion itself and one exhibit (ECF 23-8). Defendant also publicly docketed a redacted version of the Motion. ECF 26-2. In ECF 27, I granted ECF 26. However, it does not appear that the exhibits were ever unsealed, as intended. Therefore, with the exception of ECF 23-8 (Moore's medical records), I will order the Clerk to unseal the defense exhibits (ECF 23-1 to ECF 23-7; ECF 23-9).

[2] On February 21, 2020, the Court scheduled a Motion hearing for April 27, 2020. *See* ECF 30; *see also* ECF 17. But, by March of 2020, life as we had known it essentially came to a halt, due to the COVID-19 pandemic. As a result, the Court was unable to proceed on the scheduled date. On January 18, 2022, I asked counsel for a status report. ECF 36. By joint status report of January 26, 2022 (ECF 37), the parties requested the opportunity to file supplemental briefing. Following a telephone conference with counsel on April 15, 2022, I scheduled the Motion hearing. *See* ECF 45.

[3] I do not have a transcript of the Motion hearing. Therefore, to the extent that I recount what occurred at the Motion hearing, I have relied on my notes.

[4] Defendant included in the Motion a skeletal constitutional challenge to Maryland's red flag law, as applied. ECF 23 at 24-26. But, at the Motion hearing, the defense asked the Court to defer consideration of that issue.

## I.     Legal Standards

### A. *Franks* Principles

The Motion challenges the Search Warrant on the basis of both the Fourth Amendment to the Constitution and Article 26 of the Maryland Declaration of Rights.  Article 26 of the Maryland Declaration of Rights is construed *in pari materia* with the Fourth Amendment.  *Muse v. State*, 146 Md. App. 395, 401 n.7, 807 A.2d 113, 117 n.7 (2002); *see also, e.g.*, *Stutzman v. Krenik*, 350 F. Supp. 3d 366, 377 (D. Md. 2018); *Upshur v. State*, 208 Md. App. 383, 397, 56 A.3d 620, 628 (2012), *cert. denied*, 430 Md. 646 (2013).[5]

Ordinarily, an accused is not entitled to an evidentiary hearing to challenge a facially valid search warrant.  *United States v. Allen*, 631 F.3d 164, 171 (4th Cir. 2011); *see United States v. Pulley*, 987 F.3d 370, 376 (4th Cir. 2021); *United States v. Moody*, 931 F.3d 366, 370 (4th Cir. 2019), *cert. denied*, 140 S. Ct. 823 (2020).  When reviewing the issuing judge's probable cause finding, consideration is ordinarily confined to the four corners of the application documents.  *See*, *e.g.*, *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  There is, however, a narrow exception to this rule, which the Supreme Court established in the seminal case of *Franks v. Delaware*, 438 U.S. 154 (1978).  *Franks* established that, under limited circumstances, an accused is entitled to an evidentiary hearing concerning the veracity of statements in a warrant application.

In *Franks*, the Supreme Court articulated a two-prong test as to what a criminal defendant must show when challenging the veracity of statements made in an Affidavit supporting a search warrant.  The defendant has the burden to establish both prongs of the test by a preponderance of the evidence.  *Franks*, 438 U.S. at 156.  Given the "presumption of validity with respect to the

---

[5] The Fourth Amendment has been made applicable to the States via the Fourteenth Amendment.  *See Aguilar v. Texas*, 378 U.S. 108 (1964); *Mapp v. Ohio*, 367 U.S. 643 (1961).

affidavit supporting the search warrant," *id*. at 171, the Fourth Circuit has characterized the burden as a "heavy" one. *United States v. Tate*, 524 F.3d 449, 454 (4th Cir. 2008). If both prongs are met, the search warrant must be voided and the fruits of the search excluded. *Franks*, 438 U.S. at 155-56; *see Pulley*, 987 F.3d at 376.

Under the first prong—the "intentionality" prong—the defendant must show that "a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." *Franks*, 438 U.S. at 155-56. An officer acts with reckless disregard when he fails to "inform the magistrate of facts she subjectively knew would negate probable cause." *United States v. Haas*, 986 F.3d 467, 475 (4th Cir. 2021), *cert. denied*, 142 S. Ct. 292 (2021).

Under the second prong—the "materiality" prong—the defendant must show that, "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause." *Franks*, 438 U.S. at 156; *see United States v. Seigler*, 990 F.3d 331, 334 (4th Cir. 2021), *cert. denied*, 142 S. Ct. 336 (2021). In other words, the defendant must show that, without those false statements, the Affidavit cannot support the finding of probable cause. *United States v. McKenzie-Gude,* 671 F.3d 452, 462 (4th Cir. 2011); *United States v. Clenney,* 631 F.3d 658, 663 (4th Cir. 2011); *United States v. Richardson*, 607 F.3d 357, 369 (4th Cir. 2010). On the other hand, if the allegedly false statements are not necessary for the probable cause finding, the accused is not entitled to a *Franks* hearing. *Franks,* 438 U.S. at 155-156; *see also United States v. Doyle*, 650 F.3d 460, 468 (4th Cir. 2011) (stating that "false information will only void a warrant if the information was necessary to the finding of probable cause."); *Allen*, 631 F.3d at 171; *United States v. Gary*, 528 F.3d 324, 328 (4th Cir. 2008).

The two-pronged *Franks* test applies to cases "in which an agent includes affirmatively false statements in a warrant affidavit, [and] also when an agent *omits* relevant facts from the affidavit." *United States v. Lull*, 824 F.3d 109, 114 (4th Cir. 2016) (citing *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990)) (emphasis in *Lull*); *see United States v. Cioni*, 649 F.3d 276, 286 (4th Cir. 2011). But, the Fourth Circuit clarified in *Lull*, 824 F.3d at 115: "Understandably, the defendant's burden in showing intent is greater in the case of an omission because '[a]n affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation.'" (citing *Colkley*, 899 F.2d at 300). Thus, "[m]erely identifying factual omissions is insufficient." *Clenney*, 631 F.3d at 664. Therefore, the fact of omission "cannot alone show recklessness or intentionality." *Haas*, 986 F.3d at 475.

"To establish entitlement to a *Franks* hearing based on information omitted from the warrant affidavit, [the defendant] [is] required to make a 'substantial preliminary showing' that the omissions were intentional or reckless, and that the omitted information was material to the magistrate's probable cause determination." *United States v. Jones*, 942 F.3d 634, 640 (4th Cir. 2019) (citation omitted); *see United States v. Wharton*, 840 F.3d 163, 168 (4th Cir. 2016). In other words, the omission must be "necessary to the finding of probable cause." *Franks*, 438 U.S. at 156; *see also Lull*, 824 F.3d at 117. So, "to obtain a *Franks* hearing, the defendant must show that the omissions were '*designed to mislead*, or . . . made in *reckless disregard of whether they would mislead*' and that the omissions were material, meaning that their 'inclusion in the affidavit would defeat probable cause.'" *Clenney*, 631 F.3d at 664 (quoting *Colkley*, 899 F.2d at 301) (emphasis in *Clenney*).

Of import here, a showing that an officer was merely negligent, or that the omission was simply an innocent mistake, is insufficient to warrant suppression. *Franks*, 438 U.S. at 171; *Miller*

5

*v. Prince George's Cty.*, 475 F.3d 621, 627-28 (4th Cir. 2007) (citing *Franks*, 438 U.S. at 171); *see also United States v. Shorter*, 328 F.3d 167, 170 (4th Cir. 2003) ("[M]ere[] negligen[ce] in recording the facts relevant to a probable-cause determination" is not enough).   Moreover, "the significance – or insignificance – of a particular omission to the determination of probable cause may inform [the court's] conclusion regarding the agent's intent.[1]"   *Lull*, 824 F.3d at 117.

     *Franks* is inapplicable when inclusion of the omitted facts would not have changed the "probable cause calculus. . . ."   *Cioni,* 649 F.3d at 286.   As the *Jones* Court explained, if the omitted facts are inserted into the warrant Affidavit and, as "'revised,'" there is still probable cause, then the defendant is not entitled to a *Franks* hearing.   *Jones*, 942 F.3d at 640.   Put another way, if the Affidavit establishes probable cause, despite an alleged omission, the omission is of no moment.   *Jones*, 942 F.3d at 640; *Lull*, 824 F.3d at 117.   As the Fourth Circuit has explained: "For an omission to serve as the basis for a hearing under *Franks,* it must be such that its inclusion in the affidavit would defeat probable cause . . . ."   *Colkley,* 899 F.2d at 301.

     Critically, a showing of falsity "cannot be conclusory and must rest on affidavits or other evidence."   *Moody*, 931 F.3d at 370; *see also United States v. Landaverde-Giron*, No. 18-4598, 2022 WL 101941, at *1 (4th Cir. Jan. 11, 2022); *Haas*, 986 F.3d at 474-75.   Thus, "the defendant cannot rely on a purely subjective disagreement with how the affidavit characterizes the facts." *Moody*, 931 F.3d at 370.   Because "warrant affidavits are 'normally drafted by nonlawyers in the midst and haste of a criminal investigation.' . . . [t]hey must be interpreted in a commonsense manner, neither held to the standard of what judges or lawyers feel they would have written if given the opportunity nor 'judged as an entry in an essay contest.'"   *Id.* at 372 (internal citations omitted); *see also Seigler*, 990 F.3d at 344-45.

A showing of reckless disregard "is just as demanding." *Moody*, 931 F.3d at 371. "[R]eckless disregard in the *Franks* context requires a showing that the affiant personally recognized the risk of making the affidavit misleading." *Pulley*, 987 F.3d at 377. "[M]ere conclusory allegations" are not sufficient. *Moody*, 931 F.3d at 371.

However, if the affiant's material perjury or reckless statements are established by a preponderance of the evidence, then "the warrant 'must be voided' and evidence or testimony gathered pursuant to it must be excluded." *Colkley*, 899 F.2d at 300 (quoting *Franks*, 438 U.S. at 156). Indeed, if a warrant violates *Franks*, it is not subject to the good faith exception to the exclusionary rule under *United States v. Leon*, 468 U.S. 897, 923 (1984); *see Doyle*, 650 F.3d at 467.

In sum, in order to obtain an evidentiary hearing regarding the integrity of an Affidavit in support of a warrant, a defendant must first make "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." *Franks*, 438 U.S. at 155-56. This showing "must be more than conclusory," and "must be accompanied by an offer of proof" in order to overcome the "presumption of [the warrant's] validity." *Franks*, 438 U.S. at 171; *see Clenney,* 631 F.3d at 663. And, as indicated, the false information, whether statements or omissions, must be essential or material to the probable cause determination. *Franks*, 438 U.S. at 171-72.

Two *Franks* cases decided by the Fourth Circuit are among many that I could cite to illustrate the principles articulated above.

In *Colkley*, 899 F.2d 297, a bank robbery case, defendant Johnson complained that the district court should have suppressed his post-arrest incriminating statements, because the Affidavit in support of the arrest warrant did not recount that eyewitnesses failed to identify

Johnson in a photo spread.  In addition, he complained because the agent based the composite height description of the vault robber, allegedly Johnson, on the testimony of only one witness, disregarding other witnesses who described the vault robber as shorter than the person depicted in the Affidavit.  On this basis, the defendant requested and received a *Franks* hearing.

The Fourth Circuit did not agree with the district court that a *Franks* hearing was appropriate.  In its view, the defendant did not make the requisite preliminary showing that the affiant intended to mislead the magistrate, and inclusion of the omitted information would not have defeated probable cause in any event.  *Id*. at 300.

As to a claim of omission, the Fourth Circuit was mindful of "the realities of the warrant application process."  *Id*.  It stated: "An affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation."  *Id*.  Although a decision not to include information is intentional, a mere intentional omission is not within the scope of *Franks*, because the requisite intent would be satisfied in virtually every case.  The *Colkley* Court stated: "*Franks* clearly requires defendants to allege more than 'intentional' omission in this weak sense." *Id.* at 301.  The Court continued: "*Franks* protects against omissions that are designed to mislead, or that are made in reckless disregard of whether they would mislead, the magistrate . . . To obtain a *Franks* hearing, the defendant must show that the omission is the product of a 'deliberate falsehood or of reckless disregard for the truth.'"  *Id.* (quoting *Franks*, 438 U.S. at 171).

Thus, the *Colkley* Court recognized that "the affirmative inclusion of false information in an affidavit is more likely to present a question of impermissible official conduct than a failure to include a matter that might be construed as exculpatory."  899 F.2d at 301.  In its view, the most that the record revealed was the agent's "failure to include the photo spread information . . . ."  *Id*.  However, the Court declined to infer intent or recklessness from the mere fact of such an omission.

*Id.* As to that conduct, the Fourth Circuit observed that the agent's "acts fell far short of the level of flagrant police action *Franks* is designed to prevent, and a hearing under that decision was not required." *Id.*

In the Fourth Circuit's view, to the extent that the photospread information was exculpatory, it was not enough to defeat probable cause when weighed against the content of the Affidavit. *Id.* at 302. The Court recognized that "a requirement that all potentially exculpatory evidence be included in an affidavit would severely disrupt the warrant process. The rule would place an extraordinary burden on law enforcement officers, who might have to follow up and include in a warrant affidavit every hunch and detail of an investigation in the futile attempt to prove the negative proposition that no potentially exculpatory evidence had been excluded." *Id.* at 303. The Court concluded: "In short, a rule requiring affiants to disclose all potentially exculpatory information has nothing to recommend it. Unless a defendant makes a strong preliminary showing that the affiant excluded critical information from the affidavit with the intent to mislead the magistrate, the Fourth Amendment provides no basis for a subsequent attack on the affidavit's integrity." *Id.*

In *Tate*, 524 F.3d 449, the Court reached a contrary result. There, the Baltimore Police Department ("BPD") obtained a warrant to search the defendant's home for drugs. *Id.* at 450-51. There, they found a firearm, and defendant was charged with unlawful possession of a firearm by a felon. *Id.* at 451.

The warrant was obtained on the basis of a BPD officer's investigation of defendant's trash. *Id.* In the Affidavit for the search warrant, the BPD officer averred that he had searched trash bags that were "easily accessible" from the rear yard of defendant's house, and uncovered marijuana residue as well as related drug paraphernalia. *Id.* at 451.

The defendant argued that the warrant was deliberately written to mislead the judge to assume that the trash search had been conducted legally, in that it was abandoned for pickup. *Id.* at 452. In reality, according to the defendant, the BPD officer had trespassed into defendant's yard to search the trash, and therefore the search was unconstitutional under *California v. Greenwood*, 486 U.S. 35 (1988). 524 F.3d at 452. As a result, he challenged the validity of the warrant, which included the contents of the search of the trash.

To support Tate's request for a *Franks* hearing, he proffered, *inter alia*, a letter from the Division Chief of the Baltimore Department of Public Works' Bureau of Solid Waste as to when the defendant's trash collection occurred; two affidavits, one from a neighbor and another from a defense investigator concerning the trash pickup and where Tate's garbage was stored; photographs of the residence showing a locked gate and the area where the trash was kept; and a copy of another search warrant Affidavit two months earlier in an unrelated case, in which the same officer stated that the trash bags were easily accessible in language quite similar to what was in the Affidavit at issue. The district judge denied the request for a *Franks* hearing.

The Fourth Circuit concluded that Tate had made the requisite preliminary showing that the law enforcement agent had knowingly and intentionally, or with reckless disregard for the truth, omitted a material statement in the Affidavit in support of the warrant. *Id.* at 457. Focusing on the agent's omission of facts about the location of trash that had been searched, the contents of which undergirded the Affidavit, the Fourth Circuit reasoned, 524 F.3d at 456: "If Tate's facts are correct, the affidavit omitted the important details . . . that the trash had not been abandoned, and that the trash bags were seized in violation of Tate's reasonable expectation of privacy."

According to the Court, the facts, as proffered, tended to show that the agent "may have violated Tate's reasonable expectation of privacy because the trash was not out at the curb for

collection on the date of Agent Manner's search but rather in a container near the rear steps of the home." *Id.* Responding to the government's argument that the wording of the Affidavit was "literally true," the Court remarked: "A 'literally true' affidavit thus can be intentionally misleading if it deliberately omitted material facts which, when included, would defeat the probable cause showing and thus render false the original 'literally true' affidavit." *Id.* at 456-57.

Moreover, the Court determined "that if Tate's facts are true, the inclusion of the allegedly omitted information – that Agent Manners illegally searched Tate's trash – would have defeated probable cause. If the trash investigation was conducted illegally, the facts derived from it would have to be stricken from the affidavit." *Id.* at 457. And, said the *Tate* Court: "Without the facts drawn from the trash investigation, the remaining contents of the affidavit would not have supported a finding of probable cause." *Id.*

## B. Probable Cause

Assuming a *Franks* violation, the question is whether the warrant application established probable cause after excising the false information or adding the omitted information. Therefore, I pause to review briefly the concept of probable cause.

Probable cause "exist[s] where the known facts and circumstances are sufficient to warrant a [person] of reasonable prudence in the belief that contraband or evidence of a crime will be found." *Ornelas v. United States*, 517 U.S. 690, 696 (1996). Moreover, an assessment of probable cause must be based on the totality of the relevant circumstances, and not on a formulaic legal test. *Illinois v. Gates*, 462 U.S. 213, 230-31 (1983); *Allen*, 631 F.3d at 172.

In *Maryland v. Pringle*, 540 U.S. 366 (2003), the Supreme Court reiterated, *id.* at 370-71 (citations and quotations marks omitted):

> [T]he probable-cause standard is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable

and prudent men, not legal technicians, act.  Probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules.

The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances.  We have stated, however, that [t]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt, and that the belief of guilt must be particularized with respect to the person to be searched or seized[.]

As indicated, the concept of probable cause is not subject to precise definition.  *Richardson*, 607 F.3d at 369.  Rather, "[p]robable cause is a flexible standard that simply requires 'a reasonable ground for belief of guilt' and 'more than bare suspicion.'"  *United States v. Ortiz*, 669 F.3d 439, 444 (4th Cir. 2011) (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)).  The "standard" of "'reasonable ground for belief of guilt' requires less of a showing than does the formal preponderance-of-the evidence standard."  *Ortiz*, 669 F.3d at 444-45 (citing *Gates*, 462 U.S. at 235).  Indeed, such "[f]inely-tuned standards . . . useful in formal trials, have no place in the magistrate's decision."  *Gates*, 462 U.S. at 235.

Notably, a search warrant is construed "in a commonsense manner" in order to serve the "significant purpose of encouraging officers to obtain judicial approval prior to conducting a search."  *United States v. Dargan*, 738 F.3d 643, 647 (4th Cir. 2013).  An "overly stringent" construction of probable cause is not required.  *Id.* at 648.

### C.  The ERPO Statutory Scheme

Evaluating the merits of the Motion requires an understanding of Maryland's statutory scheme governing the issuance of "Extreme Risk Protective Orders" ("ERPO").  As noted, the statute is contained in Subtitle 6 of Title 5 of the Public Safety Article ("P.S.") of the Maryland Code (2018 Repl. Vol., 2021 Supp.).  It was enacted by the Maryland General Assembly in 2018

(*see* 2018 Laws, Ch. 250) and went into effect on October 1, 2018. *See id*. § 3. Thus, by the time of the search at issue in this case, the ERPO had been in effect for seven months.

The ERPO law establishes a framework by which persons found to pose an immediate danger to themselves or others may be prohibited from possessing a firearm. It contemplates three categories of orders, of increasing duration: "interim," "temporary," and "final."

An interim ERPO may be issued by a State district court commissioner upon application by a petitioner. P.S. § 5-603(a). Only certain categories of persons may petition for an ERPO. They include health care providers, law enforcement officers, spouses, and relatives. *Id*. § 5-601(e). A petition for an ERPO must, *inter alia*, "include any information known to the petitioner that the respondent poses an immediate and present danger of causing personal injury to the respondent, the petitioner, or another by possessing a firearm." *Id*. § 5-602(a)(1)(ii). Furthermore, the petition must set forth "specific facts" in support of this information; "explain the basis for the petitioner's knowledge of the supporting facts," and "describe the number, types, and location of any known firearms believed to be possessed by the respondent." *Id*. § 5-602(a)(1)(iii)-(v).

If the commissioner "finds that there are reasonable grounds to believe that the respondent poses an immediate and present danger of causing personal injury to the respondent, the petitioner, or another by possessing a firearm," the commissioner may enter an interim ERPO. *Id*. § 5-603(a)(1). An interim ERPO "shall: (i) order the respondent to surrender to law enforcement authorities any firearm and ammunition in the respondent's possession," and (ii) "prohibit the respondent from purchasing or possessing any firearm or ammunition for the duration of the interim extreme risk protective order." *Id*. § 5-603(a)(3). In general, an interim ERPO may only continue in effect for two days, after which the district court must hold a hearing for a temporary ERPO. *Id*. § 5-603(b)(1) (e).

Upon issuing an EPRO, the commissioner must "immediately forward a copy of the petition and interim extreme risk protective order to the appropriate law enforcement agency for service on the respondent." *Id*. § 5-603(c)(1).  And, of relevance here, a law enforcement officer "shall: (1) immediately on receipt of an interim extreme risk protective order, serve it on the respondent named in the order , , , ." *Id*. § 5-603(d)(1).

The statute contains detailed requirements as to the notice that must be provided to the respondent as to the ERPO.  *Id*. § 5-603(b)(2).  For example, the interim ERPO shall include "a statement that the respondent may consult an attorney regarding any matter related to the order." *Id*. § 5-603(b)(2)(ii).   And, an interim ERPO shall include notice of "the requirements for surrendering firearms and ammunition in the respondent's possession to law enforcement authorities," as well as of "the process for reclaiming firearms and ammunition on the expiration or termination of the order."  *Id*. § 5-603(b)(2)(v).

"After a hearing on a petition, whether ex parte or otherwise, a judge may enter a temporary extreme risk protective order to prohibit the respondent from possessing a firearm if the judge finds that there are reasonable grounds to believe that the respondent poses an immediate and present danger of causing personal injury to the respondent, the petitioner, or another by possessing a firearm."  *Id*. § 5-604(a)(1).  In general, a temporary ERPO "shall be effective for not more than 7 days after service of the order."  *Id*. § 5-604(c)(1).

A temporary ERPO is followed by a hearing regarding a Final ERPO.  *Id*. § 5-605(b)(1)(i). After the hearing, the judge "may enter a final extreme risk protective order to prohibit the respondent from possessing a firearm if the judge finds by clear and convincing evidence that the respondent poses a danger of causing personal injury to the respondent, the petitioner, or another by possessing a firearm."  *Id*. § 5-605(c)(1)(ii).  A Final ERPO may last up to one year.  *Id*. § 5-

14

605(f)(1).  And, a Final ERPO may be modified or rescinded, or extended by up to six months for good cause shown.  *Id*. § 5-606.

"A person who fails to comply with the provisions of an" ERPO "is guilty of a misdemeanor," punishable by a fine of up to $1,000 or imprisonment not to exceed ninety days, or both, for the first offense, and by a fine of up to $2,500 or imprisonment not to exceed one year, or both, for any subsequent offense.  *Id*. § 5-610.

Of import here, P.S. § 5-607 pertains to the issuance of a search warrant for the removal of firearms pursuant to an ERPO.  As the text indicates, a search warrant is contingent on service of the ERPO on the respondent (P.S. § 5-603(d)(1)) and the respondent's failure to surrender the firearm(s), as directed by the ERPO.  P.S. § 5-607 provides (emphasis added):

> In accordance with the provisions of § 1-203 of the Criminal Procedure Article, on application by a State's Attorney or *a law enforcement officer with probable cause to believe that a respondent who is subject to an extreme risk protective order possesses a firearm and failed to surrender the firearm in accordance with the order*, a court may issue a search warrant for the removal of the firearm at any location identified in the application for the warrant.

Firearms surrendered or seized pursuant to an ERPO must be returned by law enforcement after the expiration of the ERPO, but "only after the law enforcement agency verifies that the respondent is not otherwise prohibited from possessing the firearm or ammunition."  *Id*. § 5-608(b)(2).

## II.    Factual Summary[6]

The events culminating in the execution of the Search Warrant and the seizure of defendant's firearms all occurred on March 31, 2019.  Defendant and his wife, Christine Moore, an attorney, lived in a house on Sharp Road in Glenwood, Maryland (the "Property").  ECF 23-9 (Affidavits) at 1.  At approximately 2:00 a.m. on that date, Moore called and texted her friend, Rebecca Carter, who lives in Detroit, Michigan.  ECF 23-3 (HCPD reports) at 4.  Carter was asleep and missed the call.  *Id.*  Moore's text included a picture of a revolver and the following assertion: "found a loaded gun by Carl if I die you know what happened."  *Id.*

Later in the morning, after Carter saw Moore's text, Carter attempted to reach Moore by telephone, but was unable to do so.  ECF 23-2 (Final ERPO Hearing, Tr. of 5/6/19) at 84; ECF 23-3 at 4.[7]  Concerned, Carter called HCPD at approximately 2:00 p.m. on March 31, 2019, to request a welfare check on Moore.  ECF 23-2 at 20-21, 85-86; ECF 23-3 at 4; ECF 23-9 at 7.[8]  Carter told the dispatcher that there are "many" guns inside Moore's residence; that defendant "drinks too

---

[6] The facts are derived from the briefing and the exhibits to the Motion. Although the defense states in the Motion that its factual background section "is based upon information contained in the Exhibits attached to this Memorandum" (ECF 23 at 5), it provides no specific citation for most of its factual assertions. Although the Opposition includes its own factual narrative (*see* ECF 31 at 2-6), the narrative does not cite to anything at all.

Throughout the Memorandum Opinion, the Court cites to the electronic pagination. But, the electronic pagination does not always correspond to the page number imprinted on the particular submission.

[7] The ERPO Hearing Transcript refers to the transcript of the hearing for a Final ERPO for Moore.  As discussed, *infra*, it appears that the hearing was held on May 6, 2019. *See* ECF 23-2.

[8] The Opposition asserts, without citation to an exhibit, that Carter called 911. ECF 31 at 3. In her Affidavit, Carter avers that she called HCPD's "non-emergency number." ECF 23-9 at 7. She also testified at the ERPO hearing that she did not call 911. ECF 23-2 at 85.  Notably, the Court has not been provided with a transcript of a 911 call.

16

much" and is "mentally unstable;" and that there were problems in the couple's marriage.  ECF 23-3 at 4; ECF 23-7 at 6.

HCPD officers, including Corporal Gale, proceeded to the Property, where they set up a perimeter.  ECF 23-2 at 21; ECF 23-3 at 4.  While en route, HCPD dispatch advised the responding officers that both Moore and defendant had previously served in the military; that multiple guns were inside the residence in "plain view;"[9] and that Moore was the subject of an Emergency Petition in 2016.  ECF 23-3 at 4.[10]  At the request of Corporal Gale, dispatch also advised of two vehicles that may be registered to defendant or Moore, one of which was observed in the driveway of the Property.  *Id.*

According to the Search Warrant Affidavit, Corporal Gale also contacted the Maryland Gun Center to conduct computer checks on Moore and defendant.  ECF 23-7 at 7.  The Maryland State Police advised Gale that defendant had five firearms listed in the Maryland Automated Firearms Services System database.  *Id.*  Moore did not have any firearms listed.  *Id.*  It is unclear when these communications between HCPD and the Maryland Gun Center occurred.

At approximately 3:00 p.m., Carter called HCPD a second time to advise that she made contact with Moore, and that Moore was "alright."   ECF 23-9 at 7; *see* ECF 23-5 (HCPD communications records) at 9.  Carter attempted to "call[] off the welfare check," but this did not occur.  ECF 23-9 at 7.  Instead, shortly thereafter, HCPD dispatch made contact with Moore over

---

[9] It is unclear from the record how law enforcement officers were aware that guns were in "plain view" at the Property.

[10] "Emergency Petition" refers to the procedure to petition for the emergency evaluation of an individual, if they are thought to have a mental disorder or present a danger to the life or safety of themselves or others. *See* Md. Code (2019 Repl. Vol., 2021 Supp.), § 10-620 *et seq*. of the Health-General Article.

the telephone.  ECF 23-3 at 5; ECF 23-5 at 9.  Moore was directed to exit the residence.  ECF 23-3 at 5.

As Moore was exiting her home, she stated to the HCPD officers: "My husband didn't do anything . . . I'm the one who is suicidal."  *Id.*  She was handcuffed and then transported to a "staging area" established by HCPD near the house, where she spoke with Corporal Gale.  *Id.*; *see also id.* at 11.  In the Search Warrant Affidavit, Corporal Gale averred that Moore told her that there were "numerous guns" around the residence that belonged to defendant; that last night she had been drinking, and went and got the loaded handgun and cocked it because she "wanted to die;" that the gun was currently in the nightstand next to her bed; that she had consumed two bottles of vodka between last night and that morning; and that defendant had consumed one bottle of vodka and was still "passed out" inside the residence.  ECF 23-7 at 6; *see also* ECF 23-2 at 22.[11]

Corporal Gale also averred in the Search Warrant Affidavit that while she was talking with Moore, she detected a "moderate odor" of alcohol.  ECF 23-7 at 6.  Based on the odor, and on the amount of alcohol that Moore said she had consumed, Corporal Gale concluded that Moore was not able to provide voluntary consent to the entry into her residence by HCPD, or to the seizure of the firearms inside.  *Id.*  She testified similarly at the ERPO hearing, adding that Moore was "slurring" her words.  ECF 23-2 at 24.

The defendant has submitted an Affidavit from Moore, dated January 24, 2020.  ECF 23-9 at 5.[12]  She avers, *id.*: "I am aware that in police reports one or more police officers allege that I

---

[11]  Moore testified at the Final ERPO hearing that she does not drink vodka, and was drinking bourbon and coke. ECF 23-2 at 106-07.

[12]  The Motion is supported by several affidavits, all contained in one exhibit. On the Court's CM/ECF system, the Motion contains just one Affidavit from Moore, signed January 24, 2020. ECF 23-9 at 5-6. However, the courtesy copy of the Motion provided to Chambers contains two affidavits executed by Moore: the Affidavit signed January 24, 2020, and a second Affidavit

was not able to consent to the search of my residence.  To the contrary, I specifically indicated that I did not consent to the search of the residence.  I was competent at the time to make that decision." ECF 23-9 at 5.

The Affidavit is not precise as to when Moore made the statement to the police in which she allegedly addressed her competency.  And, at the Motion hearing, the government and defense counsel did not appear to interpret the assertion in the same way.  The defense interpreted the Affidavit to aver that Moore withheld consent when she spoke with Corporal Gale while at the Property.  This interpretation would be consistent with Moore's assertion that, contrary to what Corporal Gale alleged in her Affidavit, she was competent at the time.  On the other hand, the government seemed to interpret the Affidavit to mean that Moore withheld consent to search after she was served with the ERPO.  As discussed below, at some point Moore also advised that she was willing "not to return to [her] residence . . . ."  *Id.*

In any event, because of Moore's comments at the scene regarding suicide, HCPD "transported [Moore] to Howard County General Hospital [the 'Hospital'] for an Emergency Petition."  ECF 23-7 at 6. [13]  Presumably, the Petition would have been filed under Md. Code, § 10-620 *et seq.* of the Health-General Article ("H.G.").  ECF 23-7 at 6.  The Government asserts,

---

signed January 23, 2020, which is slightly different. Curiously, the Affidavit signed on January 23, 2020, is labelled an "Amended Affidavit."  But, I cite to the Affidavit signed January 24, 2020, because it appears to be the later of the two affidavits.

[13] The quoted language is from the Search Warrant Affidavit. The HCPD police report uses identical language. *See* ECF 23-3 at 5. The Motion asserts, without citation, that "HCPD filed an Emergency Evaluation Petition against Moore" (ECF 23 at 6), and that Moore "was committed to Howard County General Hospital under an Emergency Petition." *Id.* at 21. And, at the Final ERPO Hearing, counsel for Moore stated that the police had filed an Emergency Petition "under the Health General 10-622." ECF 23-2 at 11. However, to the extent that an Emergency Petition was formally filed, a copy has not been provided to the Court. Nor does the briefing identify the statute under which the Emergency Petition was filed. And, Moore testified that she voluntarily submitted to a psychiatric evaluation at the Hospital. *Id.* at 118.

19

without citation to the exhibits, that Moore was transported to the Hospital at about 3:45 p.m.  ECF 31 at 4.  HPCS communications records appear to indicate that an officer arrived at the Hospital at approximately that time.  ECF 23-5 at 10.  And, Moore testified at the Final ERPO hearing that she arrived at the Hospital just before 4:00 p.m.  ECF 23-2 at 119.

Records from the Hospital indicate that as of 4:57 p.m. on March 31, 2019, Moore's blood alcohol level was "90."  ECF 23-8 at 12.[14]  Provider notes reflect that as of 5:58 p.m. that day, Moore denied "any suicidal or homicidal ideation at this time."  *Id*. at 2.  And, in the same notes, the doctor noted an impression of "*mild* alcoholic intoxication."  *Id*. at 8 (emphasis added).  Later that evening, Moore voluntarily submitted to a psychiatric evaluation at the Hospital.  ECF 23-2 at 118.  She was discharged from the Hospital on April 2, 2019.  *Id*. at 120.  However, Corporal Gale testified at the Final ERPO hearing that, at the time of the Search Warrant application, she did not know when Moore would be discharged from the Hospital.  ECF 23-2 at 53-54.[15]

Police records indicate that HCPD officers began attempting to contact defendant after Moore was detained.  ECF 23-3 at 5, 9.  Eventually, HCPD dispatch made contact with the defendant, who had been asleep at home.  *Id.*

---

[14] There was uncertainty at the Final ERPO hearing as to what this number represents. *See* ECF 23-2 at 125-28. In the Motion, defendant asserts that this means 90 mg/dl, and adds: "Presumably this test was of blood serum which is less dilute than whole blood. In translation, Moore was a .08 at 4:57 PM." ECF 23 at 20. No citation or more detailed explanation is provided for this assertion, although the government does not appear to contest it.

[15] If a petition were filed for an emergency mental evaluation, an emergency evaluee may not be kept at a facility for more than 30 hours. H.G. § 10-624(b)(4). The facility must determine if the evaluee meets the requirements for involuntary admission under H.G. § 10-613 *et seq*. H.G. § 10-624(b). Persons proposed for involuntary admission must receive a hearing within ten days of confinement. H.G. § 10-632(b). An individual may also agree to voluntary admission. *Id*. § 10-624(b). However, a person who has agreed to voluntary admission may not be held for more than three days after requesting release. H.G. § 10-803(b).

Defendant exited his residence at approximately 3:25 p.m.  ECF 23-5 at 9.  At the direction of the officers, defendant walked out of the residence, got down on his knees and then his stomach, and was then handcuffed and detained by the officers.  ECF 23-3 at 5, 9.  Police records reflect that HCPD officers subsequently entered the Property to "clear" it and make sure that no one else was in the home or injured.  *Id*. at 9; ECF 23-5 at 10.

Somerlock advised the officers that there were multiple firearms in the residence.  ECF 23-3 at 9.  But, it is unclear from the record whether he provided this explanation before or after the Property was cleared by officers.  He also stated that the previous night, Moore had found the loaded gun in his nightstand and cocked it, and then awakened him to disengage it.  *Id*.  He did so, and put the gun away.  *Id*.

The officers explained the concept of an ERPO to defendant, and requested consent to temporarily remove the firearms from the residence.  *Id*. at 9-10; ECF 23-7 at 7.  Defendant declined to consent to the police entry to the Property or to their removal of his firearms.  ECF 23-2 at 26; ECF 23-3 at 10; ECF 23-7 at 7; ECF 23-9 at 2.  However, in an Affidavit of January 23, 2020 (ECF 23-9), defendant avers that he had offered to promptly remove the firearms from the residence and store them elsewhere before Moore's return.  *Id.* at 2.  Alternatively, he offered to lock them in a safe.  *Id*.

Thereafter, HCPD officers sought both an interim ERPO as to Moore and a search warrant for the Property.  The specific timeline as to when each order was obtained and served is critical to the contentions.

Pfc. John Coonts, a member of HCPD, was the petitioner for the ERPO.  *See* ECF 23-1 (the ERPO).[16]  As a basis for his belief that Moore presented an immediate and present danger of causing personal injury to herself or others, Pfc. Coonts recounted the events described above.  *Id.* at 8.  The petition averred that Moore currently possessed an unknown number of handguns, shotguns, rifles, and assault weapons throughout the residence.  *Id.*  The ERPO was signed by Howard County Commissioner Katherine Rembiszewski at 7:54 p.m. on March 31, 2019.  *Id.* at 3.  It was in effect through April 1, 2019, and a hearing for a temporary ERPO was scheduled for 1:15 p.m. on April 1.  *Id.*

HCPD also secured a search warrant regarding the firearms and ammunition at the Property.  *See* ECF 23-7.  Its legality is hotly contested.

The application for the Search Warrant is signed by Corporal Gale, under oath.  *Id.* at 3. In her Affidavit, Corporal Gale represented that she had probable cause to believe that, on or in the Property, "there is now being concealed certain property . . . [w]hich are subject to seizure pertaining to" P.S. § 5-607 and § 5-610.  ECF 23-7 at 3.  The application includes an Affidavit from Corporal Gale containing the facts she believed would establish probable cause.  *Id.* at 3-7. An attachment to the application listed the "Property/Evidence to be seized:" photographs of the interior and exterior of the premises; indicia of occupancy to establish who lives in or owns the residence; any and all firearms and ammunition; any receipts for purchases of firearms or ammunition; and any documents demonstrating possession of firearms or ammunition.  *Id.* at 8.

---

[16] The Motion refers to Pfc. Coonts as "Coontz." I use the spelling as it appears in the ERPO.

In her four-page Affidavit, Corporal Gale recounted her background, experience, and education.  *Id*. at 4-5.  She then turned to the events of March 31, 2019.  *Id*. at 5-7.  She began, *id*. at 5 (italics and bold added):

> On March 31, 2019 the *District Court Commissioner* sitting in Howard County *issued an interim Extreme Risk Protective Order* pursuant to §5-600 et seq. of the Public Safety Article of the Maryland Code. *The Extreme Risk Protective Order directed Christine Suzanne Moore . . . to immediately surrender all firearms and ammunition to the Howard County Police Department. The Extreme Risk Protective Order also advises the Respondent that failure to comply with the Order may result in criminal prosecution*.
>
> **Your affiant believes there is probable cause that the respondent is in possession of firearms contrary to the Court's Order.**

She then described the events of March 31, 2019.  ECF 23-7 at 5-7.  Of relevance here, she averred, *id*. at 6:

> While Cpl. Gale was speaking with Christine, Cpl. Gale observed that Christine had a moderate odor of an alcoholic beverage coming from her person. Based on the amount of alcohol Christine consumed and the odor of an alcoholic beverage coming from Christine's person, Cpl. Gale did not believe that Christine could voluntarily consent to Howard County Police Department entering her residence or seizing any and all firearms located inside the home.
>
> Christine was then transported to Howard County General Hospital for an Emergency Petition based on the statements Christine made regarding suicide.

The Affidavit concluded, *id*. at 7:

> Based on the aforementioned information, your affiant believes that probable cause exists that the prohibited items pertaining to Public Safety Article Section 5-607 and Section 5-610 will be found at [the Property].
>
> With this knowledge and basis for probable cause, your affiant, prays that a Search and Seizure Warrant be issued authorizing them, with the necessary and proper assistance to enter and search [the Property]; to seize all evidence and property found pertaining to the listed public safety article.

At 8:50 p.m. on March 31, 2019, Corporal Gale swore to the application for the Search Warrant before Judge Ricardo D. Zwaig of the District Court for Howard County.  *Id*. at 3, 7.  The

search warrant application was predicated solely on P.S. § 5-600 *et seq.* Judge Zwaig issued the Search Warrant at the same time, 8:50 p.m. on March 31, 2019. *Id.* at 2. The Search Warrant stated that it appeared, from the application and Affidavit, that "probable exists to believe that on or in [the Property], there is now being concealed certain property . . . [w]hich are subject to seizure pertaining to" P.S. § 5-607 and § 5-610. *Id.*

By the time Judge Zwaig approved the Search Warrant, the ERPO had been approved by Commissioner Rembiszewski for nearly an hour. *See* ECF 23-1 at 3. However, it is undisputed that at 8:50 p.m., when the Search Warrant was approved by Judge Zwaig, the ERPO had not yet been served on Moore. Nor had Moore acted contrary to the ERPO.

HCPD communications records and reports reflect that Pfc. Coonts served the ERPO on Moore at the Hospital at 8:59 p.m. on March 31, 2019, *i.e.*, nine minutes *after* Judge Zwaig approved the Search Warrant. *See* ECF 23-3 at 6; ECF 23-5 at 16. Therefore, to the extent that the Search Warrant Affidavit of Corporal Gale represented, directly or by implication, that Moore had been served with the ERPO and had not complied with it, the assertion was patently incorrect.

The Motion includes the following narrative of Moore's interaction with Pfc. Coonts when he served the ERPO, ECF 23 at 7:

> When served with the ERPO by Officer Coontz ("Coontz") [sic] Moore was not asked to surrender any firearms. Moore asked Coontz [sic] where her husband was and what was going on at her house. Coontz [sic] informed her that her husband was "safe and warm at the police station" and that the HCPD was obtaining a search warrant to seize firearms from the residence. Moore, who does not own and has never owned firearms, asked why her husband's firearms were being taken and stated that a warrant was unnecessary as she could live with a friend and not return to the residence upon her release from the hospital. Coontz [sic] responded with, "Too late . . . we are getting a warrant."

In her Affidavit, Moore avers, ECF 23-9 at 5: "In conversations with police officers on the evening of March 31, 2019 I advised police officers that I was prepared and willing, upon my

release, not to return to my residence and would reside elsewhere, if there was a concern about my return to the residence and the presence of firearms at the residence." The Affidavit does not specify when these conversations occurred. But, this description is consistent with the alternative to the Search Warrant that, according to the Motion, Moore offered to Pfc. Coonts when he served the ERPO.

HCPD officers, including Corporal Gale, executed the search warrant at about 9:30 p.m. on March 31, 2019. ECF 23-3 at 13; ECF 23-5 at 16; ECF 23-7 at 9-14 (Search Warrant return forms). They found and seized approximately 42 firearms, including the revolver pictured in Moore's text message, which was in the nightstand of a bedroom and loaded with approximately five rounds. ECF 23-2 at 28-30.

The Final ERPO hearing was held in the District Court for Howard County on May 6, 2019. *See* ECF 23-2 (Final ERPO Hearing Tr.).[17] At the conclusion of the evidentiary hearing, Judge Mary Reese denied the petition for an ERPO, ruling that the petitioner, Pfc. Coonts, had not met his burden of proving, by clear and convincing evidence, that Moore posed a threat by owning or possessing a firearm as of the day of the hearing. *Id*. at 142-43. The testimony adduced at the hearing is relevant here.

Moore recounted that she had been drinking until 2:00 a.m. or 3:00 a.m. in the early morning hours of March 31, 2019. *Id*. at 108. She testified that she did not "like guns very much at all," and so when she found the revolver, it "upset [her]." *Id*. at 108-09. This prompted her to send the text to Carter. *Id*. at 109-10. During this period, defendant was asleep, and the couple had not been "arguing at all." *Id*. at 110. She cocked the gun, but then "got scared" because she

---

[17] Surprisingly, the parties do not specify the date of the hearing in their briefing. Nor does the transcript for the hearing reflect the date. But, a statement by Moore's counsel during the hearing indicates that the hearing was held on May 6, 2019. *See* ECF 23-2 at 92.

did not know how to disengage it.  *Id.* at 116.  She woke up defendant to ask him to disengage it; he did so and placed it in the nightstand.  *Id.*  At some point, she fell asleep and did not wake up until approximately 3:00 p.m., when she discovered Carter's attempts to communicate with her. *Id.* at 110-114.

Further, Moore testified that when she told the HCPD officers that she was suicidal, this was untrue.  *Id.* at 117.  She explained that she was concerned that the officers would assume that defendant had assaulted or threatened her, and so she made the assertion to ensure that they did not think defendant had done anything wrong.  ECF 23-3 at 117.

Corporal Gale also testified.  *Id.* at 18-61.  During her testimony, Corporal Gale discussed the process that led to the issuance of the Search Warrant.  I quote liberally from this testimony, given its relevance, *id.* at 26-27, 47-56, 58-60 (emphases added):

> Ms. Peltzman:[18] Okay. Corporal Gale, based on your presence there, did you or anybody in your presence do a consent search of the house?
>
> Officer Gale: No. No consent was obtained.
>
> Ms. Peltzman: Now at that point what happened to . . . Okay, Ms. Moore was taken for the EP. Did somebody apply for an emergency risk protection order at that point?
>
> Officer Gale: Yes, PFC Coonts did.
>
> Ms. Peltzman: Okay. And to your knowledge, was that granted at that time?
>
> Officer Gale: Yes.
>
> Ms. Peltzman: Okay. And as a result, what happened next?
>
> Officer Gale: I then went ahead and I applied for a search warrant for the residence.
>
> Ms. Peltzman: And what was the purpose of the search warrant?

---

[18] Ms. Peltzman, an attorney from the Howard County Office of Law, was counsel for HCPD and Coonts. Moore was represented by Mr. Mack.

Officer Gale: To look for guns inside the house.

*     *     *

Mr. Mack: So Officer Gale, I'm just showing you defendant's exhibit number one. That's the application for search and seizure warrant that you filled out, correct?

Officer Gale: Yes sir.

Mr. Mack: So you went to Judge Zwaig that day. Actually I guess you had to go to the police station first to type all this stuff out, correct?

Officer Gale: That's correct.

Mr. Mack: All right, because the first part of the affidavit on page one to four is your background. So that's something you could put on every search warrant that you want. And then you get into the specific allegations on March 31st right?

Officer Gale: Yes.

Mr. Mack: Okay. So when you do this application for search and seizure warrant that you're looking at there, are you placed under oath?

Officer Gale: When I give it to him.

Mr. Mack: Correct?

Officer Gale: Yes.

Mr. Mack: Okay. I mean you sign it on that first page and give it to Judge Zwaig and you're placed under oath in front of Judge Zwaig, correct?

Officer Gale: Yes sir.

Mr. Mack: Okay. Now is everything in that application for search and seizure warrant truthful, accurate, and complete?

Officer Gale: To the best of my knowledge, yes.

Mr. Mack: All right. Well, do you want to look at it and make sure that there's nothing that maybe was a typographical error or something? I'm not worried about typographical errors, but anything of substance?

Officer Gale: I mean, would you like me to read the search warrant to myself?

Mr. Mack: Sure. It's been more than a month.

27

Officer Gale: Yes. I don't see anything wrong, but I'm sure there is if you're going this way.

&ast;  &ast;  &ast;

Mr. Mack: Okay. Now between the time that Officer Perlman transports Ms. Moore to the hospital.

Officer Gale: Okay.

Mr. Mack: Okay. 'Cause that's the last time you saw Ms. Moore, correct?

Officer Gale: Yes sir.

&ast;  &ast;  &ast;

Mr. Mack: Are you, notified about anything Ms. Moore's done? Anything illegal that she's done between the time of her transport until the time you swear out that warrant?

Officer Gale: No.

&ast;  &ast;  &ast;

Mr. Mack: *All right. So then why do you say the second paragraph from the bottom, your affiant believes there's probable cause that their respondent is in possession of firearms contrary to the court's order. Why did you put that in there?*

Officer Gale: *Because that's the wording that we were advised to use for the search warrants regarding [inaudible] from our command.*

Mr. Mack: What probable cause do you have that she did anything in contravention to an order?

Officer Gale: All right I'm looking at.

Mr. Mack: To a court order?

Mr. Mack: . . . What evidence, what probable cause did you have when you swore this out, that my client was in possession of firearms, contrary to the court's order?

Officer Gale: *The courts [sic] order that I would be going by would be that, with getting a, with getting an ERPO. You can't have firearms.*

Mr. Mack: *You got the [ERPO] after she was placed in custody, correct?*

28

Officer Gale: *That's correct.*

Mr. Mack: *There was no court order prior to March 31st when the police arrived at the home and then brought her somewhere and a court order was issued. Correct[?]*

Officer Gale: But she resides at that house and if she resides at that house then, she has possession of the firearms that are in that house, just like she's possession of everything else that is in that house. And I was advised she's married to him. So they both have possession of that.

Mr. Mack: *But the court order came after she was removed from the home, correct?*

Officer Gale: *Yes.*

Mr. Mack: The court order came after she was brought from Officer Perlman's vehicle to the hospital, correct?

Officer Gale: That's correct.

Mr. Mack: And you went and swore this out to [Judge] Zwaig after that, correct?

Officer Gale: That's correct. But it's still her property.

Mr. Mack: *So you didn't have any probable cause that she violated any court order because the court order just came about after she was brought out of the house, correct?*

Officer Gale: *That's correct.*

Mr. Mack: *So why'd you put that in there?*

Officer Gale: *Because she still has, the property is still hers.* That ERPO says she can't have it. We have to go remove it. She's not consenting for us to sit there and go in there and get it. That's why we're getting the search warrant. Because once the ERPO is provided to her, if she still has firearms, she can't keep the firearms and the ERPO states that she can't have the firearms.

Mr. Mack: But you said you didn't have any evidence that she was brought back home on March 31st, 2019, correct?

Officer Gale: Not in her direct possession, but it's in possession of her house and we don't know when she's getting out.

Mr. Mack: Do you remember when I asked you if you had any evidence that she was brought back to the house on March 31st, 2019, you said no, correct?

Officer Gale: That's correct, and I agree with you.

Mr. Mack: She was still at the hospital into April 1st, 2019, correct?

Officer Gale: That's correct. But the ERPO didn't end before she was released from the hospital, so we need to remove the firearms before she comes back to the house.

Mr. Mack: She couldn't have violated the court order because she was in the hospital. Do you understand that?

Officer Gale: I understand that, yeah, but I'm just saying with the ERPO, it's still in her possession. It's still in her house, not in her direct possession, but it is in her house.

Mr. Mack: You have no evidence that she violated the court's order, correct?

Officer Gale: That she had it on her person? You're absolutely right. I had no evidence that she had any guns on her person. But they were in her residence.

Mr. Mack: *The court order was not in place until after she was brought out of the residence, correct?*

Officer Gale: *That's correct.*

Mr. Mack: *And then you told Judge Zwaig that she violated a court order, correct?*

Officer Gale: *I didn't tell Judge Zwaig she violated a court order. The ERPO states she's not allowed to have possession. I'm not saying she had possession of the firearm on her person or with her at the hospital. The possession was in her house.* When somebody is getting an EP, you do not know when they're going to get released from the house. So there, so part of the ERPO is for us to remove the guns before they get back to the house, so they are not in her actual possession, but possession is what's in her house, what's in her residence.

Mr. Mack: But she wasn't in the residence for sure when you appeared before Judge Zwaig on March 31st, 2019 when you said you had probable cause that she was in possession of firearms, meaning at that time, correct?

Officer Gale: She was in possession at her house of them. They were in her residence and she couldn't consent to them and we couldn't make her consent to removing the firearms ourselves. Not for multiple reasons, but the possession with the possession in her house, not possession on her person--

Mr. Mack: But she wasn't in her house.

*       *       *

Ms. Peltzman: Corporal Gale, can you tell me, first of all, how many ERPOs have you been involved in?

Officer Gale: This is the first one.

Ms. Peltzman: Okay. How does the timing work in this case? How did the timing work regarding the ERPO compared to the search warrant.

Officer Gale: *The ERPO was written and served on her before the search warrant was conducted.*

Ms. Peltzman: And why is that to your knowledge, your understanding of the law?

Officer Gale: *Because the ERPO is the one that gives us the right to take the guns away from her, her or him, whoever it involves. And when we can't get consent* to do, to take the guns, then we do the search warrant to remove the guns from the house.

Ms. Peltzman: Okay. And as far as the section that Mr. Mack just pointed you to multiple times, what did you mean by that when you wrote that?

Officer Gale: That the possession of the firearms are the ones in her residence at that time.

Ms. Peltzman: Okay. *And at that point there had already been an ERPO signed by the judge to say that there could not be any possession of firearms, correct?*

Officer Gale: *That's correct.*

*       *       *

Mr. Mack: So you knew about the timing of the ERPO petition and that Ms. Moore was brought to the hospital for an EP evaluation, correct?

Officer Gale: Yes, sir.

Mr. Mack: You could have explained all that to Judge Zwaig in your application for search and seizure warrant, correct?

Officer Gale: I don't understand what you're asking.

31

Mr. Mack: You just explained to us why you did, why you said what you said there, correct?

Officer Gale: Correct.

Mr. Mack: Okay. So you didn't explain that to Judge Zwaig that day when you filled out this application for search and seizure warrant, correct?

Officer Gale: I didn't explain that--

Mr. Mack: Why are you asking for it?

Officer Gale: Why I'm asking for the search warrant?

Mr. Mack: Correct.

Officer Gale: That's my probable cause, why I was asking for the search warrant.

Ms. Peltzman: I'm going to object, your Honor, because I think number one, it's been, you know like going over multiple times. Number two, I mean this is the way the law works. As the officer just testified, it's the ERPO itself, that once that [sic] signed, that's what allows you to get the search warrant to go into the house. By the time she applied for the search warrant, the ERPO had in fact been signed.

Mr. Mack: It's not, it's not the way the law works to say something inaccurate in search and seizure warrants, sworn to under oath, that there was probable cause that she violated a court order when the court order was in place at the same time. There's no evidence.

Somerlock's indictment followed on July 30, 2019.  ECF 1.  As noted, the Indictment charges that on or about March 31, 2019, defendant was in possession of four weapons that are illegal under federal law: a Glock-type firearm with a machine gun-conversion device, and no serial number; two M-16-type firearms, with no serial number; and a silencer, also with no serial number.  *Id.*

Additional facts are included in the discussion, *infra*.

### III.   Contentions

The Motion asks the Court to suppress all evidence, including derivative evidence, obtained from the search of defendant's Property pursuant to the Search Warrant, "on the grounds

that said evidence is the fruit of an unconstitutional search and seizure in violation of the rights guaranteed" by the Fourth Amendment and Article 26 of the Maryland Declaration of Rights.  ECF 23 at 1.

The Motion argues, first and foremost, that the Search Warrant Affidavit included several material false statements and that they were intentionally false, or made with a reckless disregard for the truth.  *Id*. at 1-2, 9-10.  The Motion identifies several interrelated assertions that it argues were made in the Search Warrant Affidavit:

- That the ERPO had been served on Moore by the time Gale applied for the search warrant.  ECF 23 at 9-18, 22-23.

- That Moore had refused to surrender firearms in her possession after having been served with the ERPO.  *Id*. at 9-18, 22-23.

- That a crime had been committed by Moore, namely a violation of P.S. § 5-610.  *Id*. at 26.

- That Moore was not competent to provide voluntary consent to a search of the Property or to the surrender of the firearms.  *Id*. at 18-21.

- That Moore was in possession of firearms, when in fact she was at the Hospital.  *Id*. at 21-23.

- That the firearms located at the Property were Moore's firearms.  *Id*. at 23.

Furthermore, the Motion asserts that material information was purposely or recklessly omitted from the Search Warrant, and that these omissions were designed to mislead, or made in reckless disregard of whether they would mislead:

- That Moore was never asked to surrender her firearms pursuant to the ERPO.  *Id*. at 27.

- That Moore offered to live somewhere else, rather than at the Property, as an alternative to the seizure of the firearms. *Id.*

- That defendant offered to remove the firearms from the Property without the need for an ERPO, by storing them elsewhere, or, instead, by placing them in a gun safe. *Id.* at 10, 26, 28.

The Motion argues that all of the false statements and omissions set forth above were critical to the determination that Corporal Gale's Affidavit established probable cause for the issuance of the Search Warrant. *Id.* at 9-10. In addition, defendant contends that the Search Warrant was overbroad, because it authorized the search of items beyond what is permitted by P.S. § 5-607. ECF 23-2 at 23-24.[19]

The government counters that, even accepting defendant's claimed errors as true, defendant has offered no evidence of the necessary intent to mislead, or reckless disregard of the truth. ECF 31 at 7-10. It makes this argument as a general matter, and also in response to defendant's specific contentions as to the alternatives purportedly offered by defendant and Moore to surrendering the firearms; Moore's competency; and the fact that the ERPO was served after the Search Warrant was issued. *Id.* at 10-18. The government also argues that certain claimed errors were not errors at all. *Id.* at 18-19. For example, it asserts that the Search Warrant Affidavit in fact disclosed that Moore was in the Hospital and that she did not own any firearms. *Id.* at 18. And, it contends that it was not in error to state that Moore possessed firearms. *Id.* at 18-19.

---

[19] Although the Motion indicates that it is a *Franks* motion, it also summarily claims that the ERPO statute is unconstitutional, as applied. According to the defendant, the ERPO statute deprived him of due process, because he was not a respondent as to the ERPO, yet his personal property was seized as a result of the ERPO. ECF 23 at 24-26. The government defends the constitutionality of the ERPO statute, both facially and as applied to defendant. ECF 31 at 24-27. At the Motion hearing, defense counsel suggested that the Court defer consideration of the constitutional challenge.

Although the government concedes that the good faith exception does not apply to a *Franks* violation, the government contends that, nevertheless, the "principles" of *United States v. Leon*, 468 U.S. 897, should apply to preclude the application of the exclusionary rule.  ECF 31 at 20; *see id*. at 19-22.  In the alternative, the government argues that the doctrine of inevitable discovery applies, because the HCPD officers would have inevitably secured another warrant to search the Property.  *Id*. at 22-24.  And, the government takes issue with defendant's remaining arguments, such as his claim that the Search Warrant was overbroad.  *Id*. at 27-29.

## IV.     Discussion

I turn to the principal issue addressed here: whether the Court should hold an evidentiary hearing under *Franks*.  This is a distinct question from the underlying issue of whether the evidence from the Search Warrant should be suppressed.  As stated, the defendant must make a "substantial preliminary showing" as to the two *Franks* prongs of intentionality and materiality.  *See Franks*, 438 U.S. at 155.

## A.

Defendant wages multiple attacks on the validity of the Search Warrant.  Several of the arguments miss the mark, however.

Somerlock contends that Corporal Gale made a false statement in the Search Warrant Affidavit when she averred that, at the time she spoke with Moore at the Property, she did not believe Moore was competent to consent to the police entry into her residence or to the surrender of any firearms.  ECF 23 at 18-21; *see* ECF 23-7 at 6.  This argument is based on the information provided by Moore to Corporal Gale at the time; Hospital medical records; and Moore's Affidavit.  ECF 23-9 at 5.

In her Search Warrant Affidavit, Corporal Gale averred that she did not believe Moore was competent to consent because of the odor of alcohol emanating from her, and based on what Moore had told Corporal Gale as to the amount of alcohol she had consumed.  ECF 23-7 at 6.  Corporal Gale testified similarly at the Final ERPO hearing, adding there that Moore was slurring her words at the time.  ECF 23-2 at 24.

It is possible that, as defendant asserts, Corporal Gale was incorrect in her assessment of Moore's competency.  But, there is no indication that Corporal Gale intentionally or recklessly made a false statement as to her concern about Moore's capacity to consent.

Further, defendant argues that Corporal Gale falsely asserted in her Affidavit in support of the Search Warrant that Moore was in "possession" of firearms when, in reality, she was at the Hospital under an Emergency Petition, and the firearms were at her residence.  ECF 23 at 21-22.  However, the Search Warrant Affidavit disclosed that Moore had been transported to the Hospital for an emergency mental health evaluation.  ECF 23-7 at 6-7.  It also made multiple references to firearms located at Moore's residence.  *Id.*  Corporal Gale testified at the ERPO hearing as to her understanding of joint and constructive possession, without necessarily using those words, as the basis for her view that Moore was in "possession" of firearms because they were located at Moore's own house.  *See* ECF 23-2 at 51-56.

Corporal Gale's understanding was certainly reasonable; it was consistent with the definitions of joint and constructive possession as those terms are often defined in criminal cases.  For example, a person need not have actual physical custody of an object in order to be in legal possession of it.   If an individual has the ability to exercise substantial control over an object that he does not have in his physical custody, then he is in possession of that item.  *See*, *e.g.*, *United States v. Armstrong*, 187 F.3d 392, 396 (4th Cir. 1999) ("A person has constructive possession

over contraband when he has ownership, dominion, or control over the contraband itself or over the premises or vehicle in which it was concealed."). And, as to joint possession, more than one person may have the power and intention to exercise control over an object. *See, e.g.*, *United States v. Burgos*, 94 F.3d 849, 873 (4th Cir. 1996).

Moreover, there is a total absence of any facts indicating that Corporal Gale intentionally or recklessly made a false statement as to the concept of possession. "[T]he defendant cannot rely on a purely subjective disagreement with how the affidavit characterizes the facts." *Moody*, 931 F.3d at 370. And, because "warrant affidavits are 'normally drafted by nonlawyers in the midst and haste of a criminal investigation.' . . . [t]hey must be interpreted in a commonsense manner" and not "held to the standard of what judges or lawyers feel they would have written if given the opportunity . . . ." *Id*. at 372 (internal citations omitted).

**B.**

Corporal Gale asserted in her Affidavit that "the respondent is in possession of firearms contrary to the Court's Order." ECF 23-7 at 5. At best, this was erroneous. To assess the gravity of the error, it is necessary to place the Search Warrant in its proper context within the ERPO statutory scheme.

As discussed, the ERPO statute contains detailed requirements for the notice that an interim ERPO must provide to a respondent, including "the requirements for surrendering firearms and ammunition in the respondent's possession to law enforcement authorities." P.S. § 5-603(b)(2)(v)(2). And, the statute specifies that when a commissioner issues an interim ERPO, the commissioner "shall . . . immediately forward a copy of the petition and interim [ERPO] to the appropriate law enforcement agency *for service on the respondent*," *id*. § 5-603(c)(1), and a law

enforcement officer "*shall . . . immediately on receipt of an interim [ERPO], serve it on the respondent named in the order.*" *Id*. § 5-603(d)(1) (italics added).

Furthermore, the ERPO statute explicitly authorizes the issuance of a search warrant for the removal of firearms, *but only when the respondent is subject to an ERPO* and only when there is noncompliance by the respondent. The statute states: "[O]n application by a State's Attorney or a law enforcement officer with probable cause to believe that a respondent who is subject to an [ERPO] possesses a firearm *and failed to surrender the firearm* in accordance with the order, a court may issue a search warrant for the removal of the firearm at any location identified in the application for the warrant." *Id*. § 5-607 (emphasis added). P.S. § 5-610 sets out penalties for a "person who fails to comply with the provisions" of an ERPO. *Id*. § 5-610(a).

In other words, the statute provides a detailed scheme for service and notice to a respondent as to his or her obligations under an ERPO. *Cf. Caniglia v. Strom*, ___ U.S. ___, 141 S. Ct. 1596, 1601 (2021) (Alito, J., concurring) (noting that red-flag laws "typically specify the standard that must be met and the procedures that must be followed before firearms may be seized"). A search warrant may be issued to remove firearms subject to an ERPO. But, to obtain a search warrant to do so, it is a necessary precondition for the issuance of such a warrant that the respondent has failed to surrender the firearms pursuant to an ERPO served on the respondent. *Id*. § 5-607.

The Search Warrant sought by Corporal Gale and approved by Judge Zwaig was issued pursuant to P.S. § 5-607. Significantly, the Search Warrant was premised solely on the ground that the residence contained firearms subject to seizure under P.S. § 5-607 and § 5-610. *See* ECF 23-7 at 2-3, 5-7. The application cites no other predicate criminal offense or statute.

Notably, Corporal Gale testified at the ERPO hearing: "[T]he ERPO is the one that gives us the right to take the guns away from her . . . . And when we can't get consent to do, to take the

guns, then we do the search warrant to remove the guns from the house."  ECF 23-2 at 56; *see also id*. at 27, 52.  Therefore, assertions in the Search Warrant Affidavit as to whether the ERPO had been served and whether Moore, as the respondent, had failed to surrender firearms pursuant to the ERPO, were of critical importance.

In this regard, the Search Warrant Affidavit avers, in relevant part (ECF 23-7 at 5):

On March 31, 2019 the District Court Commissioner sitting in Howard County issued an interim Extreme Risk Protective Order pursuant to §5-600 et seq. of the Public Safety Article of the Maryland Code. The Extreme Risk Protective Order directed Christine Suzanne Moore . . . to immediately surrender all firearms and ammunition to the Howard County Police Department. The Extreme Risk Protective Order also advises the Respondent that failure to comply with the Order may result in criminal prosecution.

Your affiant believes there is probable cause that the respondent is in possession of firearms contrary to the Court's Order.

This language does not explicitly state that the ERPO had been issued and served on Moore, or that she had failed to surrender the firearms in accordance with the ERPO.  But, the natural and straightforward reading of this language, in context, is that Moore had been served with an ERPO and thus subject to it, thereby requiring her immediately to surrender the firearms to HCPD.  It also suggests that, contrary to the ERPO, Moore did not do so.  There is no other logical construction of the phrase that Moore "is in possession of firearms contrary to the Court's Order." *Id*.  But, Moore could not be said to have "failed to surrender" a firearm, contrary to the ERPO, unless the ERPO had been served on her, which is a necessary event under P.S. § 5-607 for issuance of the Search Warrant.

The Search Warrant Affidavit was sworn before Judge Zwaig at 8:50 p.m. on March 31, 2019.  ECF 23-7 at 3.  Likewise, the Search Warrant was approved by Judge Zwaig at 8:50 p.m. *Id*. at 2.  And, it is undisputed that the ERPO was not served on Moore until 8:59 p.m. on March 31, 2019, some nine minutes *after* the Search Warrant was issued.  *See* ECF 23-3 at 6; ECF 23-5

at 16. Indeed, there is no indication from the record that Moore was even aware of the ERPO before it was served on her. And, because it had not yet been served, as of 8:50 p.m. Moore had not yet had any opportunity to surrender the firearms, nor did she fail to do so, "contrary to the Court's order." ECF 23-7 at 5. As defendant puts it: "Moore could not have failed to consent to the terms of an order that she had not received." ECF 32 at 5. Therefore, the assertions in the Affidavit, set forth above, were plainly false.

The government concedes that, at the time the Search Warrant was issued, the ERPO had not yet been served on Moore. Indeed, at the Motion hearing, the government acknowledged that, insofar as the Search Warrant Affidavit asserted that Moore was subject to the ERPO at that time, it was inaccurate. Moreover, the government agreed at the Motion hearing that the ERPO had to be served on Moore in order for Moore to have surrendered the firearms. But, the government characterizes Corporal Gale's assertion as an "honest mistake." *See* ECF 31 at 14-15 ("The affidavit omits that service of the extreme-risk order on Somerlock's wife was nine minutes away. This was a mistake . . . . If anything, [Corporal Gale] made an honest mistake that was cured within nine minutes.").

Alternatively, the Search Warrant Affidavit omitted a key piece of information, namely that although an ERPO had been issued, Moore had not yet been served with it, and she had not yet indicated whether or not she would surrender the firearms. If characterized as an omission, the circumstances bear some similarity to those of *Tate*, in which the Affidavit for the search warrant was "literally true" as to the affiant's trash search, but omitted key details that indicated that the search was unconstitutional. *See Tate*, 524 F.3d at 453-58.

At the Motion hearing, the government argued that P.S. § 5-607 does not require an affirmative refusal to comply with the ERPO, but merely a failure to surrender the firearms. The

government contended, in essence, that under this interpretation, there was a basis for the assertion in the Search Warrant Affidavit that Moore was in possession of firearms, contrary to the ERPO; Moore allegedly lacked the ability to consent to a surrender of the firearms.

To make its point, the government invoked a hypothetical scenario in which a respondent was not competent to make an affirmative refusal. Even so, this does not alter the requirement that, before law enforcement seeks a search warrant predicated on an ERPO violation, the ERPO must be served on a respondent, and the respondent must be given the opportunity to surrender the weapon(s). Clearly, these critical steps had not occurred at the point that Corporal Gale swore to the Affidavit and obtained the Search Warrant.

In a similar vein, the government contended at the hearing that, in fact, Corporal Gale did not believe that Moore was competent to decide whether to surrender the firearms or abide by the ERPO. And, according to the government's logic, the assertion in the Search Warrant Affidavit as to possession of firearms contrary to the ERPO was premised on this lack of competency. In my view, there are several problems with this contention.

First, regardless of Moore's mental state, the ERPO had to be served on her, which indisputably had not occurred at the relevant time. Second, the Affidavit represents that Moore had not complied with the ERPO, not that she was unable to comply. Although the Affidavit makes assertions as to Moore's competency, it does so only in the context of events that occurred between approximately 3:00 p.m. and 4:00 p.m. on March 31, 2019, when Moore spoke with Corporal Gale and indicated that she had been drinking. As a result, Corporal Gale determined that Moore then lacked the capacity to consent to a search of the Property and to the surrender of firearms, because she had been drinking. *See* ECF 23-7 at 6. However, there is no suggestion in the Search Warrant Affidavit that Gale had any basis to question Moore's capacity many hours

41

later, after the effects of the alcohol would have subsided, or that Moore otherwise lacked the competency to comply with an ERPO at 8:50 p.m.

Of course, the existence of a false statement or an omission is not enough to justify a *Franks* hearing. The defendant must make a "substantial preliminary showing" that "a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit," and that "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause." *Franks*, 438 U.S. at 155-156. And, "[t]o establish entitlement to a *Franks* hearing based on information omitted from the warrant affidavit, [the defendant] [is] required to make a 'substantial preliminary showing' that the omissions were intentional or reckless, and that the omitted information was material to the magistrate's probable cause determination." *Jones*, 942 F.3d at 640.

The second prong—materiality—seems relatively straightforward here. The defense must show that, without the false statement, the Affidavit cannot support the finding of probable cause, or that there would still be probable cause if the omission were inserted. *Id*.; *McKenzie-Gude*, 671 F.3d at 462; *Clenney*, 631 F.3d at 663. Here, as discussed, the Search Warrant was premised on the fact that Moore possessed firearms contrary to the ERPO—or, to use the language of the statute authorizing the warrant, that Moore was "subject to an [ERPO and] possesses a firearm and failed to surrender the firearm in accordance with the order." P.S. § 5-607.

If the Search Warrant Affidavit had not asserted that Moore possessed firearms contrary to the ERPO, it is difficult to discern a basis on which Judge Zwaig would have found probable cause to issue the Search Warrant. Likewise, if the Search Warrant Affidavit had indicated that Moore had not yet been served, it is difficult to see how there would have been probable cause for the issuance of the search warrant.

The difficult issue is the first prong, regarding intentionality.  This is the focus of the government's argument in opposition.  *See* ECF 31 at 14-18.  Mere negligence, or sloppy draftsmanship, is inadequate under *Franks*, 438 U.S. at 171; *see Moody*, 931 F.3d at 370; *Shorter*, 328 F.3d at 170.  The inclusion of the false statement must be knowing or intentional, or with reckless disregard for the truth.  As to omissions, the defendant must show the omissions were designed to mislead, or made in reckless disregard of whether they would mislead.  *Clenney*, 631 F.3d at 664.  But, a "literally true" Affidavit may still "be intentionally misleading if it deliberately omitted material facts which, when included, would defeat the probable cause showing."  *Tate*, 524 F.3d at 456.  And, "reckless disregard in the *Franks* context requires a showing that the affiant personally recognized the risk of making the affidavit misleading."  *Pulley*, 987 F.3d at 377.

In my view, based on the evidence in the record, defendant has made a substantial preliminary showing of intentionality, such that a *Franks* hearing should be held.  Notably, Corporal Gale provided extensive testimony, under oath, at the Final ERPO hearing in May 2019.  Her testimony offered a window into her state of mind, and included her understanding of the facts as well as the law related to the ERPO and to the Search Warrant Affidavit.  *See* ECF 23-2 at 18-61.

Previously, I quoted, at length, Corporal Gale's testimony from the Final ERPO hearing.  Therefore, I merely summarize it here, as follows:

- Corporal Gale clearly had an understanding of what was required by the ERPO statute, and in order to obtain a search warrant under P.S. § 5-607.  Notably, she affirmed that Moore could not have firearms under the ERPO "once the ERPO is provided to her."  *Id*. at 52.  And, she indicated that the issuance of the ERPO had to precede the issuance of the search warrant, because an ERPO prohibits a respondent from possessing

firearms, and a search warrant is used to remove the firearms if the respondent will not give consent. *Id*. at 56. She testified: "The ERPO was written and served on [Moore] before the search warrant was conducted." *Id*.

- Moore's counsel asked Corporal Gale why she had averred that "there is probable cause that the respondent is in possession of firearms contrary to the Court's Order." Corporal Gale replied: "Because that's the wording that we were advised to use for the search warrants regarding [inaudible] from our command." ECF 23-2 at 50. This suggests a complete disregard for the facts and the law.

- Corporal Gale affirmed that, between the point that Moore was transported by HCPD to the Hospital and when she swore out the Search Warrant application, she was not notified as to any misconduct, or anything illegal, that Moore had done. *Id*. at 49.

- Defense counsel asked Corporal Gale: "So you didn't have any probable cause that she violated any court order because the court order just came about after she was brought out of the house, correct?" *Id*. at 52. Corporal Gale responded: "That's correct." *Id*. Then, when asked why she had included the assertion as to probable cause, Corporal Gale testified that the "property" at the house (*i.e.*, the firearms) was still hers, and under the ERPO, she could not "have" such property. *Id*. And, she stated: "She's not consenting for us to sit there and go in there and get it. That's why we're getting the search warrant. Because once the ERPO is provided to her, if she still has firearms, she can't keep the firearms and the ERPO states that she can't have the firearms." *Id*. But, at the time the Search Warrant Affidavit was sworn out, the ERPO had not been "provided" to Moore, and Moore had not had the opportunity, in response to the ERPO, to decide whether or not to abide by the ERPO, *i.e.*, consent to removal of the firearms.

- When Corporal Gale was asked by defense counsel if she had "told Judge Zwaig that [Moore] violated a court order," she responded that she "didn't tell Judge Zwaig [Moore] violated a court order," only that Moore had guns in her possession at the residence. *Id*. at 54. But, the Search Warrant Affidavit refers to "probable cause that the respondent is in possession of firearms *contrary to the Court's Order*." ECF 23-7 at 5 (emphasis added).

To be sure, Corporal Gale's testimony is not dispositive as to her intent. It is certainly possible that evidence presented at a *Franks* hearing would show that, as the government asserts, Corporal Gale made an innocent mistake. *See Tate*, 524 F.3d at 457 (noting higher standard at *Franks* hearing). But, at this juncture, Corporal Gale's testimony supports a substantial preliminary showing as to intent. The record raises the serious possibility that when Corporal Gale submitted her Affidavit, she either knew that Moore had not been served with the ERPO, and had not yet failed to surrender the firearms, or she acted with reckless disregard as to whether this had occurred, despite her understanding of the ERPO process, the search warrant process, and the importance of such information. *See* ECF 23-2 at 52, 56.

The Fourth Circuit made clear in *Moody*, 931 F.3d at 371-72, that an imprecisely worded Affidavit cannot by itself serve as the basis to infer an intentional mental state. If all that was before the Court was the Search Warrant Affidavit itself, then my conclusion might be different. In this case, however, we have extensive testimony, under oath, provided by Corporal Gale at the ERPO hearing in May 2019. And, it is suggestive of the "independent, identifiable proof of the affiant's state of mind" that the government contends is necessary. ECF 31 at 9.

In an ends-justify-the-means argument, the government claims that "the officers cured the defect by quickly serving Somerlock's wife, and her continuing lack of consent made the warrant

still necessary." ECF 31 at 17.  I am not persuaded by this argument, which essentially contends that making a false statement in a search warrant affidavit should be excused if subsequent events bring about a circumstance that was nonetheless untrue when it was asserted.  Probable cause exists on the basis of "known facts and circumstances." *Ornelas*, 517 U.S. at 696.  And, if Judge Zwaig would not have found probable cause in the face of an accurate Search Warrant Affidavit, this determination does not change based on a prediction from the government that Moore would not have surrendered the firearms, even if she had been served with the ERPO.  Obviously, the government could not know how Moore, a lawyer, would respond when confronted with a court order.

At the Motion hearing, defense counsel contended that the existing record provides a basis for the Court to grant the Motion, without even the need for a *Franks* hearing.  Defense counsel did not cite authority for the proposition that the Court may grant a *Franks* motion without a *Franks* hearing.  Regardless, the record does not support this outcome.  Although the existing materials suffice for the substantial preliminary showing required for a hearing, they do not foreclose the possibility that Corporal Gale's mental state did not rise to the level of an intentional or reckless error.  I cannot make such a determination without an evidentiary hearing.

## C.

Seeking to obviate the need for a *Franks* hearing and the possible suppression of evidence, the government makes two final arguments, regarding the exclusionary rule and inevitable discovery.  ECF 31 at 19-24.  According to the government, there is no need to hold a *Franks* hearing because, even if there was a *Franks* violation, the evidence should not be suppressed in light of the principles that undergird the exclusionary rule and based on principles of inevitable discovery.  Accordingly, I briefly address these contentions here.

The government acknowledges, as it must, that the good faith exception to the exclusionary rule does not apply to a *Franks* violation. *Id*. at 19; *see Leon*, 468 U.S. at 914; *Doyle*, 650 F.3d at 467; *Colkley*, 899 F.2d at 300. Nevertheless, it argues that "while *Leon* would not literally apply, its principles should." ECF 31 at 20. And, according to the government, because the HCPD officers conducting the search acted in an objectively reasonable fashion, making only "isolated, inadvertent errors," exclusion should not occur. *Id*. at 22.

The government has not provided adequate authority for the bold claim that, despite the fact that the good faith exception does not apply to a *Franks* violation as a matter of black letter law, the Court should apply something akin to the good faith exception. None of the cases cited by the government do what the government seeks here, *i.e.*, find a *Franks* violation but reject suppression. Indeed, the principal cases invoked by the government are quite far afield from the *Franks* context. *See Davis v. United States*, 564 U.S. 229, 232 (2011) (searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule); *Herring v. United States*, 555 U.S. 135, 137, 147-48 (2009) (negligent police recordkeeping error did not require application of the exclusionary rule). Conversely, the Fourth Circuit has remarked, in no uncertain terms, *Colkley*, 899 F.2d at 300: "If a *Franks* hearing is appropriate and an affiant's material perjury or recklessness is established by a preponderance of the evidence, the warrant 'must be voided' and evidence or testimony gathered pursuant to it *must be excluded*." (Quoting *Franks*, 438 U.S. at 156) (emphasis added).

The government's argument puts the cart before the horse. The argument is premised on the idea that the HCPD officers made only inadvertent mistakes—that they did "everything by the book." ECF 31 at 21. But, if there is a *Franks* violation regarding the Search Warrant Affidavit— that is, an intentional or reckless false statement or omission—then, by definition, the errors here

would not be inadvertent.  Yet, this is what a *Franks* hearing would determine.  In addition, the purpose of the exclusionary rule is deterrence; it should be applied where it would deter future Fourth Amendment violations.  *Davis*, 564 U.S. at 237-38.  And, if a *Franks* violation occurred, it would seem that exclusion would, in fact, deter future misconduct.

Further, the government contends that the inevitable discovery doctrine should apply because, even without the Search Warrant, "officers would have secured another warrant, ultimately getting them back into the house."  ECF 31 at 22.  "Inevitable discovery demands that the prosecution prove by a preponderance of the evidence: first, that police legally *could* have uncovered the evidence; and second, that police *would* have done so."  *United States v. Alston*, 941 F.3d 132, 138 (4th Cir. 2019) (emphases in original), *cert. denied*, 140 S. Ct. 1221 (2020); *see also Nix v. Williams*, 467 U.S. 431, 443-44 (1984).

"'A finding of inevitable discovery necessarily rests on facts that did not occur,' but 'by definition the occurrence of these facts must have been likely, indeed inevitable, absent the government's misconduct.'"  *Alston*, 941 F.3d at 138 (quoting *United States v. Allen*, 159 F.3d 832, 840 (4th Cir. 1998)).  "[T]he fact making discovery inevitable must 'arise from circumstances other than those disclosed by the illegal search itself.'"  *United States v. Thomas*, 955 F.2d 207, 211 (4th Cir. 1992) (quoting *United States v. Boatwright*, 822 F.2d 862, 865 (9th Cir. 1987)).  "The inevitable discovery exception 'involves no speculative elements but focuses on demonstrated historical facts.'"  *Alston*, 941 F.3d at 139 (quoting *Nix*, 467 U.S. at 444 n.5).[20]

---

[20] The government asserts that inevitable discovery applies in the *Franks* context, citing to *United States v. George*, 971 F.2d 1113, 1121 (4th Cir. 1992). *See* ECF 31 at 22. *George* was not a *Franks* case, but the Fourth Circuit did state that inevitable discovery could apply even in a situation in which the *Leon* good faith exception did not. *See* 971 F.2d at 1121. Defendant has not contested this premise.

According to the government, because neither Moore nor the defendant would have surrendered the firearms pursuant to the ERPO, the HCPD officers would have inevitably obtained a warrant to search the house and would have discovered the firearms.  But, I cannot conclude on this record that Moore would have failed to surrender the weapons, at least with the inevitability required by the case law.

For example, the Motion asserts that when Pfc. Coonts ultimately served the ERPO on Moore, she was not asked to surrender any firearms, and the execution of the search warrant was presented as a fait accompli.  ECF 23 at 7.  However, Moore offered to stay somewhere other than her house as an alternative.  *Id*.; *see* ECF 23-9 at 5.  If this version of events is true, it requires excessive speculation to predict what Moore and the HCPD officers might have done if Moore had been served with the ERPO before issuance of the search warrant, as the statute required, and then asked to surrender her firearms.

As mentioned, Moore avers in her Affidavit that she withheld consent for the police to search her residence, without specifying precisely when she did so.  *See* ECF 23-9 at 5.  Defense counsel asserts that this refers to Moore's previous interaction with Corporal Gale, before going to the Hospital.  Regardless, withholding consent to search the Property is distinct from failing to surrender firearms in response to an ERPO.

Moreover, as the defense notes (ECF 32 at 11), Somerlock was not the person subject to the ERPO.  Therefore, his refusal to surrender his firearms would not have allowed the HCPD to obtain a search warrant under P.S. § 5-607.  And, no other conduct by him has been alleged that would have created probable cause for a search warrant.

Accordingly, I conclude that the government's inevitable discovery argument is not sufficient to obviate the basis for a *Franks* hearing.

## V.      Conclusion

For the reasons set forth above, I am satisfied that the defendant has made the requisite substantial preliminary showing that is required to hold a *Franks* hearing.

An Order follows, consistent with this Memorandum Opinion.

Date:   May 4, 2022                                    _____/s/_____

Ellen L. Hollander
United States District Judge

50